Robert and Toni AMSTADT
et al., Petitioners,

v.

UNITED STATES BRASS
CORPORATION,
Respondent.

UNITED STATES BRASS
CORPORATION et al.,
Petitioners,

v.

Emery H. and Susan KOCHIE
et al., Respondents.

UNITED STATES BRASS CORPORA-
TION, Shell Oil Company d/b/a Shell
Chemical Company, and Hoechst Cela-
nese Corporation, Petitioners,

v.

Nabeel ANDRAUS et al., Respondents.

Nos. 94–0008, 94–0023 & 94–0123.

Supreme Court of Texas.

Argued Feb. 21, 1995.

Decided March 7, 1996.

Rehearing Overruled May 10, 1996.

George M. Fleming, Mark A. Hovenkamp, James R. Moriarty, Michael O'Brien, Houston, for petitioners.

Kurt T. Nelson, Loreta H. Rea, Mark R. Zeidman, Houston, William Powers, Jr., Austin, for respondents.

Kevin H. Dubose, Michael Samford, Houston, Marc Kasowitz, Daniel R. Benson, Susan M. Lee, New York City, Kurt T. Nelson, Loreta H. Rea, Houston, for petitioners.

Michael O'Brien, James R. Moriarty, George M. Fleming, Mark A. Hovenkamp, Houston, for respondents.

Michael Samford, Kevin H. Dubose, Houston, Marc Kasowitz, Daniel R. Benson, Susan M. Lee, Peter T. Shapiro, Hector Torres, New York City, Robert D. Daniel, Jerry L. Mitchell, Jr., Marjorie C. Bell, Daniel A. Hyde, D. Ferguson McNeil, Mary Lou Strange, Jack W. Tucker, Jr., Stephanie K. Crain, Marie R. Yeates, Houston, Robbi B. Hull, Austin, Kurt T. Nelson, Loreta H. Rea, Houston, for petitioners.

James R. Moriarty, Mark A. Hovenkamp, Michael O'Brien, George M. Fleming, Houston, for respondent.

CORNYN, Justice, delivered the opinion of the Court, in which PHILLIPS, Chief Justice, and HECHT, ENOCH, BAKER and ABBOTT, Justices, join.

In these three cases, homeowners have sued the manufacturers of a polybutylene plumbing system for negligence and violations of the Deceptive Trade Practices–Consumer Protection Act. TEX.BUS. & COM.CODE

§§ 17.41–17.63 (DTPA). The common issue is whether the Legislature intended that upstream suppliers of raw materials and component parts be liable under the DTPA when none of their misrepresentations reached the consumers. This precise issue, which to our knowledge has never before been raised in the twenty-three-year history of the DTPA, animates the appeals in *Barrett v. United States Brass Corp.*, *Knowlton/Kochie v. United States Brass Corp.*, and *United States Brass Corp. v. Andraus.* In *Knowlton/Kochie* we also consider a res judicata issue; in *Barrett,* a comparative liability issue.

We hold that, although the homeowners who obtained a jury finding of negligence may recover on that theory, no homeowner may recover from Celanese, Shell, or U.S. Brass under the DTPA because these manufacturers' alleged DTPA violations did not occur in connection with the homeowners' purchase of their homes. We accordingly reverse the judgments of the courts of appeals with regard to DTPA liability in all three causes. We remand *Andraus* and *Kochie* to the trial courts for rendition of judgment in favor of those homeowners who received favorable jury findings on their negligence claims. We reverse the court of appeals' judgment in *Knowlton* on res judicata grounds and render judgment that the *Knowlton* households take nothing, and reverse and remand *Barrett* to the trial court to resolve the comparative liability issue in accordance with this opinion.

## I. FACTS

### *U.S. Brass, Shell, and Celanese v. Andraus*

In *Andraus,* the owners of approximately 95 homes in the Fairmont Park West subdivision in La Porte, Texas, sued General Homes Corporation (the developer and homebuilder), U.S. Brass, Shell Oil Company, and Hoechst Celanese Corporation after experiencing problems with their plumbing.

U.S. Brass designed and manufactured the plumbing system.

The plumbing system used flexible plastic pipes made of polybutylene resin connected by fittings made of a plastic compound called Celcon. The pipes and fittings were joined together by a copper or aluminum crimp ring placed around the outside of the pipe at the point where the pipe and fitting were connected. The ring, fitting, and pipe were then compressed using a large wrench-like tool designed by U.S. Brass. The pressure from the crimp ring deformed the pipe and fitting, creating a water-tight seal.

Celanese manufactured Celcon and supplied Celcon pellets to U.S. Brass to be molded into fittings. Celanese promoted the use of Celcon in plumbing applications to U.S. Brass and other manufacturers, and knew that U.S. Brass used Celcon to make the fittings. Shell produced the polybutylene resin and provided it in raw form to U.S. Brass. U.S. Brass formed the resin into the pipe used in the plumbing system.

In the early 1980s, U.S. Brass and Shell promoted the plumbing system to municipal officials in La Porte in order to obtain building code approval of the system for residential use. U.S. Brass and Shell also marketed the system to homebuilders, including General Homes. General Homes installed U.S. Brass' plumbing system in homes it built in 1980, 1981, and 1982.

In 1982, some of these systems began to fail. Cracks developed in the Celcon fittings that eventually caused leaks. At trial, the parties vigorously disputed what caused the fittings to fail. Some of the experts testified that degradation of the Celcon from exposure to the households' chlorinated water caused the cracks in the fittings. Others testified that inadequate design, defective manufacture, and improper installation, or a combination of these problems along with chemical degradation created excessive stress, which caused the fittings to crack.

The homeowners [1] sued General Homes, U.S. Brass, Shell, Celanese, and Vanguard

1. Most of the homes were owned by married couples, but some were owned by individuals.

During discovery and trial, the members of each household were treated as one plaintiff. For

Plastics, Inc. (a competitor of U.S. Brass, later dismissed from the suit). General Homes is not a party to this appeal. The homeowners alleged that the plumbing system's failure caused property damage and mental anguish. They sought damages based on negligence, fraud, and violations of the DTPA.

A jury found that U.S. Brass, Shell, and Celanese had made misrepresentations under the DTPA and were negligent. The jury also found that U.S. Brass had acted unconscionably and was grossly negligent. The trial court ruled that the statute of limitations barred the negligence claims of fifty-six households, and rendered a take-nothing judgment against five households for unspecified reasons. Three households elected to recover on the negligence findings, and the trial court rendered judgment accordingly. The trial court also rendered judgment for the eighty-six households that elected recovery under the DTPA.

Celanese, Shell, and U.S. Brass appealed. The court of appeals reversed the trial court's judgment in part and affirmed it in part. 1993 WL 313208. Specifically, the court of appeals affirmed DTPA liability because it concluded that "there was a link between the representations made and the use of the plumbing system in the plaintiffs' homes, which ultimately caused damage." *Id.* at *17.

### Knowlton v. U.S. Brass, Shell, and Celanese; Kochie v. U.S. Brass.

In *Knowlton/Kochie*, homeowners sued General Homes, Buckner Boulevard Plumbing Company (a plumbing contractor), Celanese, Shell, U.S. Brass, and Vanguard. They asserted claims for negligence, strict liability, and misrepresentation and unconscionability under the DTPA based on the defendants' representations about the characteristics of the plumbing systems to homebuilders. They claimed that absent such representations, General Homes would not have installed the defective systems.

Celanese, Shell, U.S. Brass, and General Homes moved for summary judgment based on res judicata and the statute of limitations. The trial court granted the motion with respect to five households, led by the Knowltons, without specifying the grounds. The Knowlton households had bought their homes from people who had previously sued and recovered damages caused by the plumbing systems.

The remaining households, led by the Kochies, dismissed their claims against General Homes, Buckner, Celanese, and Shell, and proceeded to trial against U.S. Brass and Vanguard. After closing argument but before the jury returned a verdict, they also settled with Vanguard. The jury returned a verdict in favor of sixty-nine households. Forty-eight households elected recovery under the DTPA and twenty-one elected recovery for negligence. The trial court rendered judgment accordingly against U.S. Brass.

U.S. Brass appealed, complaining that the Kochie homeowners were not consumers under the DTPA. The court of appeals rejected that complaint. 864 S.W.2d 585, 592–93. The Knowlton homeowners also appealed. The court of appeals reversed the summary judgment rendered against them, holding that neither res judicata nor the statute of limitations barred their actions. *Id.* at 605–06.

### Barrett v. U.S. Brass

In *Barrett*, several hundred homeowners sued nine companies, including U.S. Brass, alleging negligence, strict liability, and violations of the DTPA. The trial court put thirty-six homeowners to trial as a test group. The group settled with all defendants except U.S. Brass.

The trial proceeded against U.S. Brass. The trial court directed a verdict against nine households because U.S. Brass' products were not used in their homes. These nine did not appeal. The jury found in favor of twenty-three households for negligence and DTPA violations, but found against four

example, one set of jury questions was asked for each couple. In this opinion, the words "homeowner," "household," and "plaintiff" are used interchangeably, and may refer to more than one person.

households. The trial court rendered judgment against the four latter households, who were also unsuccessful at the court of appeals. The twenty-three households that obtained favorable jury findings elected to recover under the DTPA. The trial court, however, granted U.S. Brass' motion to disregard the jury's answers under the DTPA and rendered judgment based solely on negligence.

The court of appeals reversed the judgment in part, holding that all the homeowners were consumers under the DTPA, but that only seven of the twenty-three homeowners had produced sufficient evidence that U.S. Brass' misrepresentations were a producing cause of their injuries. 864 S.W.2d 606. The court also held that there was no evidence of producing cause with regard to the sixteen other households. *Id.*

## II. DTPA

### A.

■ The DTPA grants consumers a cause of action for false, misleading, or deceptive acts or practices. TEX.BUS. & COM. CODE § 17.50(a)(1); *Riverside Nat'l Bank v. Lewis,* 603 S.W.2d 169, 173 (Tex.1980). The DTPA defines a "consumer" as "an individual ... who seeks or acquires by purchase or lease, any goods or services." TEX.BUS. & COM.CODE § 17.45(4). Privity of contract with a defendant is not required for the plaintiff to be a consumer. *E.g., Home Sav. Ass'n v. Guerra,* 733 S.W.2d 134, 136 (Tex. 1987); *Kennedy v. Sale,* 689 S.W.2d 890, 892–93 (Tex.1985); *Flenniken v. Longview Bank & Trust Co.,* 661 S.W.2d 705, 707 (Tex.1983); *Cameron v. Terrell & Garrett, Inc.,* 618 S.W.2d 535, 540–41 (Tex.1981). A consumer must, in order to prevail on a DTPA claim, also establish that each defendant violated a specific provision of the Act, and that the violation was a producing cause of the claimant's injury. TEX.BUS. & COM.CODE § 17.50(a); *Doe v. Boys Clubs of Greater Dallas, Inc.,* 907 S.W.2d 472, 478 (Tex.1995).

The manufacturers argue that DTPA liability, while not limited to those in contractual privity with the consumer, cannot extend to all entities in the chain of production or distribution when none of those entities' alleged misrepresentations ever reached the consumer. The homeowners, on the other hand, argue that a misrepresentation by any entity in the chain of distribution that is the cause-in-fact of actual damages entitles them to recover under the DTPA. We do not agree with the homeowners' contention. To accept the homeowners' argument would extend DTPA liability to upstream manufacturers or suppliers to an extent not intended by the Legislature when it enacted the DTPA.

The purpose of the DTPA is to "protect consumers against false, misleading, and deceptive business practices, unconscionable actions, and breaches of warranty and to provide efficient and economical procedures to secure such protection." TEX.BUS. & COM. CODE § 17.44. As we have explained, that purpose is, in part, to encourage consumers to litigate claims that would not otherwise be economically feasible and to deter the conduct the DTPA forbids. *See Smith v. Baldwin,* 611 S.W.2d 611, 616 (Tex.1980); *Pennington v. Singleton,* 606 S.W.2d 682, 690 (Tex.1980); *Woods v. Littleton,* 554 S.W.2d 662, 670 (Tex.1977); *see also* Montford et al., *1989 Texas DTPA Reform: Closing the DTPA Loophole in the 1987 Tort Reform Laws and the Ongoing Quest for Fairer DTPA Laws,* 21 ST. MARY'S L.J. 525, 576 (1990).

■ Although the DTPA was designed to supplement common-law causes of action, we are not persuaded that the Legislature intended the DTPA to reach upstream manufacturers and suppliers when their misrepresentations are not communicated to the consumer. Despite its broad, overlapping prohibitions, we must keep in mind why the Legislature created this simple, nontechnical cause of action: to protect consumers in consumer transactions. Consistent with that intent, we hold that the defendant's deceptive conduct must occur in connection with a consumer transaction, as we explain below.

In *Cameron v. Terrell & Garrett, Inc.,* we said: "The Act is designed to protect consumers from any deceptive trade practices *made in connection with* the purchase or lease of any goods or services." 618 S.W.2d 535, 541 (Tex.1981) (emphasis added). The

in-connection-with requirement imposes a limitation on liability that is consistent with the underlying purposes of the DTPA. Without this limitation, we would merely substitute the defendant's introduction of a particular product into the stream of commerce for the conduct that was found to have violated the DTPA. We find no authority for shifting the focus of a DTPA claim from whether the defendant committed a deceptive act to whether a product that was sold caused an injury.

Requiring a connection between the plaintiffs, their transactions, and the defendants' conduct enunciates a limitation we have alluded to, but not fully articulated, in prior cases. *See, e.g., Qantel Business Sys., Inc. v. Custom Controls Co.,* 761 S.W.2d 302, 305 (Tex.1988) (noting that deceptive conduct may be actionable under the DTPA if it is "inextricably intertwined" with a consumer transaction) (quoting *Knight v. International Harvester Credit Corp.,* 627 S.W.2d 382 (Tex. 1982); *Birchfield v. Texarkana Memorial Hosp.,* 747 S.W.2d 361, 368 (Tex.1987) (stating that a plaintiff establishes standing to sue under the DTPA in terms of her relationship to a transaction); *Guerra,* 733 S.W.2d at 136 (stating that a defendant creditor "must be shown to have *some connection* either with the actual sales transaction or with a deceptive act related to" it) (emphasis added); *Flenniken,* 661 S.W.2d at 707 (holding that a bank may be subject to DTPA liability because its actions occurred "in *the context of*" the consumer's purchase of a home) (emphasis added); *Knight v. International Harvester Credit Corp.,* 627 S.W.2d 382, 388–89 (Tex. 1982) (concluding that a consumer had a DTPA claim for the defendant's deceptive acts "*connected with*" a sale); *Cameron,* 618 S.W.2d at 541 (ruling that the DTPA protects "consumers from any deceptive trade practice made *in connection with* the purchase or lease of any goods or services") (emphasis added); *see also Southwestern Bell Tel. Co. v. Boyce Iron Works, Inc.,* 726 S.W.2d 182, 187 (Tex.App.—Austin 1987) (holding that "neither the telephone company's representations asserted in the agency hearing nor its course of conduct were the producing cause of Boyce's actual damages" given the absence of "proof that any representation or any course of conduct by the telephone company influenced Boyce's purchase of the alarm company's protective services"), *rev'd on other grounds,* 747 S.W.2d 785 (Tex.1988); *Taylor v. Burk,* 722 S.W.2d 226, 229 (Tex.App.—Amarillo 1986, writ ref'd n.r.e.) (affirming the trial court's judgment notwithstanding the verdict in favor of Burk on a DTPA claim because Taylor presented no evidence that Burk "was *connected with* the real estate transaction between Taylor and the Millers"). While our words have varied, the concept has been consistent: the defendant's deceptive trade act or practice is not actionable under the DTPA unless it was committed *in connection with* the plaintiff's transaction in goods or services.

■ In the three cases before us today, the homeowners purchased homes equipped with polybutylene plumbing systems. These systems are goods, and they form the basis of the homeowners' complaints. The homeowners are therefore consumers under the DTPA. TEX.BUS. & COM.CODE § 17.45(4). To determine whether the defendants may be liable under the DTPA, we must examine whether their conduct occurred in connection with the plaintiffs' purchase of their homes.

### B. Celanese

■ Celanese manufactured the polybutylene compound, Celcon, and supplied Celcon pellets to U.S. Brass for its use in molding the plumbing system fittings. Celanese promoted the use of Celcon in plumbing applications to U.S. Brass and other manufacturers, and knew that U.S. Brass used Celcon to make fittings for its plumbing systems. Celanese did not control U.S. Brass' selection of raw materials, did not design the parts or tools, and did not instruct or train the homebuilders' plumbers. Celanese told U.S. Brass that it should mold prototype components from Celcon and subject them to the most severe anticipated end-use conditions. Celanese also informed U.S. Brass of Celcon's potential limitations in high-chlorine conditions. Celanese's marketing efforts were limited to promoting its material to the manufacturers of the plumbing systems. It did not market the systems to homebuilders or building code officials, or market the fin-

ished homes to the consumers. The manufacturers of the plumbing systems and the building code officials, and to a lesser degree the homebuilders, were intermediaries capable of assessing the suitability of Celcon for use in the systems.

None of these facts supports the conclusion that Celanese's misrepresentations were made in connection with the plaintiffs' purchase of their homes. Celanese exercised little or no control over the manufacture and installation of the finished plumbing systems, much less the manufacture and sale of the homes. Celanese had no influence over the terms of the sales to the homeowners. At most, Celanese enjoyed the benefit of selling a raw material to a downstream manufacturer.

We hold that, under these circumstances, Celanese's conduct did not occur in connection with the plaintiffs' purchase of their homes; consequently, that conduct cannot support DTPA liability. Therefore, we reverse the court of appeals' judgment in *Andraus* permitting recovery under the DTPA against Celanese. (Celanese had no judgment rendered against it in either *Knowlton/Kochie* or *Barrett.*)

## C. Shell

■ Shell produced the polybutylene resin from which U.S. Brass manufactured the pipes used in the plumbing system. As with Celanese, Shell did not control U.S. Brass' selection of raw materials, did not design the parts or tools, and did not instruct or train the homebuilders' plumbers. However, Shell played a substantial role in marketing U.S. Brass' entire system for new homes in the early 1980s. It undertook a marketing campaign and directly contacted homebuilders to promote the system and increase the market for polybutylene resin. Several homebuilders testified that they learned about U.S. Brass' plumbing system from Shell at trade shows and from Shell salespeople who visited them. The record contains some evidence that La Porte building officials would not have approved the plumbing system for residential use absent Shell's representations about its quality, reliability, and longevity. Finally, there is some evidence that the homebuilders installed the systems in reliance on the same representations.

As was the case with Celanese, these facts do not support the conclusion that Shell's misrepresentations were made in connection with the relevant consumer transactions, the purchase of the homes. Shell had no control over the manufacture or installation of the plumbing systems, or of the homes ultimately purchased by the consumers. Shell had no influence over the terms of the consumers' purchases. Although Shell actively promoted use of the plumbing systems in residential homes, there is *no evidence that the information provided to homebuilders or building code officials was intended to be or actually was passed on to consumers.* Importantly, Shell's marketing efforts were not incorporated into the efforts to market homes to the plaintiffs in this case. Also, any information provided by Shell was subject to independent evaluation by building code officials and by homebuilders.

We therefore conclude that Shell's conduct was not sufficiently connected with the plaintiffs' purchase of their homes to support DTPA liability. We therefore render judgment in *Andraus* that plaintiffs take nothing from Shell on their DTPA claims. (No judgment was rendered against Shell in *Knowlton/Kochie* or *Barrett.*)

## D. U.S. Brass

■ U.S. Brass designed and manufactured the plumbing system at issue. It selected the raw materials, designed and manufactured the parts and tools, and trained the homebuilders' plumbers. In the late 1970s and early 1980s, U.S. Brass sought approval of the system for residential use from building code officials. Together with Shell it conducted a sales campaign aimed at the new home market and targeted individual builders. U.S. Brass represented to builders that the polybutylene plumbing system was durable and would last twenty-five years, was easy to install, required fewer joints, and was a quality product with characteristics superior to copper, galvanized steel, and PVC plumbing systems. U.S. Brass' and Shell's representatives met with homebuilders many times. U.S. Brass also provided homebuild-

ers with a catalog on the plumbing system representing that the pipes and fittings would not corrode and that the pipes would not freeze or experience mineral build-up.

Although the conduct of U.S. Brass comes closer to being in connection with the plaintiffs' purchase of their homes than the conduct of Shell or Celanese, it also falls short of meeting the nexus required for DTPA liability. U.S. Brass exercised significant control over the design and installation of the plumbing systems, but as with Shell and Celanese, U.S. Brass had no role in the sale of the homes to the plaintiffs. As with Shell, U.S. Brass' marketing efforts were not intended to, nor were they, incorporated into the marketing of the homes to the plaintiffs. Finally, U.S. Brass' products were subject to independent evaluation by building code officials, homebuilders, and the plumbing contractors who installed the materials. Viewed in this context, we conclude that U.S. Brass' actions were not connected with the plaintiffs' transactions, that is, the sale of the homes, in a way that justifies liability under the DTPA.

Our analysis of U.S. Brass' connection with the consumer transactions applies with equal force to allegations based on misrepresentations and unconscionable acts. The subject matter of the misrepresentations and the conduct found to be unconscionable is virtually identical. Because we conclude that the totality of U.S. Brass' involvement in the consumer transaction is insufficient to support DTPA liability, we reverse the judgments against U.S. Brass under both theories of DTPA liability.

■ Although we have concluded that the homeowners have no DTPA cause of action against Celanese, Shell, and U.S. Brass, no one disputes that they have a DTPA cause of action against General Homes, their seller. Given this recourse under the DTPA against the seller, and the contribution and indemnity provision of the DTPA, *see* TEX.BUS. & COM.CODE § 17.555, we think that rather than permit limitless upstream DTPA liability under these circumstances, the Legislature more likely intended for consumers to seek DTPA recourse against those with whom they have engaged in a consumer transaction. Then, to the extent that the seller's DTPA liability is caused or contributed to by the otherwise actionable misconduct of upstream manufacturers or suppliers, the seller may seek contribution or indemnity against them. Additionally, homeowners may obtain direct relief for foreseeable injuries due to the negligence of these parties.

## III. *KNOWLTON*—RES JUDICATA

Under our holding today, the Knowlton homeowners are not entitled to maintain DTPA causes of action against the manufacturers because the manufacturers' conduct did not occur in connection with their consumer transactions. Therefore, the court of appeals erred in reversing the take-nothing judgment in favor of Celanese, Shell, and U.S. Brass as to the DTPA claims. We turn to the question of whether res judicata bars the Knowlton homeowners' negligence and strict liability claims.

### A.

■ Res judicata precludes relitigation of claims that have been finally adjudicated, or that arise out of the same subject matter and that could have been litigated in the prior action. *Barr v. Resolution Trust Corp.*, 837 S.W.2d 627, 628 (Tex.1992). It requires proof of the following elements: (1) a prior final judgment on the merits by a court of competent jurisdiction; (2) identity of parties or those in privity with them; and (3) a second action based on the same claims as were raised or could have been raised in the first action. *See Texas Water Rights Comm'n v. Crow Iron Works*, 582 S.W.2d 768, 771–72 (Tex.1979). The question presented in this case is whether the Knowlton homeowners are in privity with prior owners of their homes who sued for damages allegedly caused by the defective plumbing systems in *Michael Diehl v. General Homes Corp.*, No. 87–21479 (141st Dist. Ct., Harris County, Tex., Mar. 3, 1989).

■ Generally people are not bound by a judgment in a suit to which they were not parties. *See* TEX.CIV.PRAC. & REM.CODE § 37.006(a). The doctrine of res judicata creates an exception to this rule by forbidding a second suit arising out of the same

subject matter of an earlier suit by those in privity with the parties to the original suit. *See Crow Iron Works*, 582 S.W.2d at 771–72. The purposes of the exception are to ensure that a defendant is not twice vexed for the same acts, and to achieve judicial economy by precluding those who have had a fair trial from relitigating claims. *Benson v. Wanda Petroleum Co.*, 468 S.W.2d 361, 363 (Tex. 1971).

People can be in privity in at least three ways: (1) they can control an action even if they are not parties to it; (2) their interests can be represented by a party to the action; or (3) they can be successors in interest, deriving their claims through a party to the prior action. *Getty Oil Co. v. Insurance Co. of N. Am.*, 845 S.W.2d 794, 800 (Tex.1992); *Benson*, 468 S.W.2d at 363.

To determine whether subsequent plaintiffs are in privity with prior plaintiffs, we examine the interests the parties shared. *See Texas Real Estate Comm'n v. Nagle*, 767 S.W.2d 691, 694 (Tex.1989). Privity exists if the parties share an identity of interests in the basic legal right that is the subject of litigation. *Id.* To determine whether a prior and later lawsuit involve the same basic subject matter, we focus on the factual basis of the complaint. *Barr*, 837 S.W.2d at 630. If the second plaintiffs seek to relitigate the matter which was the subject of the earlier litigation, res judicata bars the suit even if the second plaintiffs do not allege causes of action identical to those asserted by the first. *See id.* at 630; *Crow Iron Works*, 582 S.W.2d at 771–72. Res judicata also precludes a second action on claims that arise out of the same subject matter and which might have been litigated in the first suit. *Crow Iron Works*, 582 S.W.2d at 772; *Cain v. Balcom*, 130 Tex. 497, 109 S.W.2d 1044, 1045–46 (1937). Under the foregoing standards, we consider whether the *Knowlton* plaintiffs were in privity with the *Diehl* plaintiffs, so that res judicata bars the Knowltons' suit.

### B.

U.S. Brass and Celanese argue that the *Knowlton* plaintiffs were in privity with the *Diehl* plaintiffs because the *Knowlton* plaintiffs were successors in interest who derived their rights in property from the *Diehl* plaintiffs. We agree. " '[A]ll persons are privy to a judgment whose succession to the rights of property therein adjudicated are derived through or under one or the other of the parties to the action, and which accrued subsequent to the commencement of the action.' " *Kirby Lumber Corp. v. Southern Lumber Co.*, 145 Tex. 151, 196 S.W.2d 387, 388 (1946) (quoting *Cain*, 109 S.W.2d at 1046). As a matter of law, the *Knowlton* plaintiffs were in privity with the *Diehl* plaintiffs because they succeeded to the rights of property in the homes. *See id.* (" 'Privity, in this connection, means the mutual or successive relationship to the same rights of property.' "). Although the rule that res judicata bars the claims of successors in title arose in the context of land and property rights disputes, *see, e.g., Freeman v. McAninch*, 87 Tex. 132, 27 S.W. 97, 98–100 (1894), it applies here as well. As we stated in a water rights dispute, "one acquiring an interest in the property involved in a lawsuit takes the interest subject to the parties' rights as finally determined by the court." *Crow Iron Works*, 582 S.W.2d at 771.

For both the *Diehl* and *Knowlton* plaintiffs, the right at issue was the right to be compensated for injuries caused by the defective plumbing systems. The two lawsuits involved the same subject matter, the same houses, and the same plumbing systems. The negligence, gross negligence, products liability, and DTPA claims were virtually identical. Because the *Knowlton* plaintiffs are the *Diehl* plaintiffs' successors in interest and because they brought virtually identical claims concerning the same subject matter, we hold that res judicata bars the *Knowlton* plaintiffs' suit.

### IV. *BARRETT*—COMPARATIVE LIABILITY

Finally, we turn to the issue of comparative liability when the negligence of several defendants causes an indivisible injury. The court of appeals held that for certain plaintiffs in *Barrett*, "there is no evidence from which the jury could have allocated the liability as it did between U.S. Brass and

Vanguard," and that accordingly, "there was no evidence of causation of damage to the homes and personal property" of those plaintiffs. 864 S.W.2d at 633.

If, however, there was evidence that U.S. Brass' negligence was a proximate cause of the plaintiffs' damages, U.S. Brass' responsibility for that damage did not evaporate if the jury erred in apportioning liability between U.S. Brass and Vanguard. If the injuries arising from the plumbing system could not be apportioned with reasonable certainty, then the plaintiffs' injuries were indivisible, and the defendants are jointly and severally liable for the whole. *See Landers v. East Tex. Salt Water Disposal Co.,* 151 Tex. 251, 248 S.W.2d 731, 734 (1952). Because the plaintiffs established the elements of their negligence claims, they are entitled to recover from U.S. Brass for its negligence. We accordingly reverse the court of appeals' take-nothing judgment as to the plaintiffs' negligence claims, and remand those claims to the trial court. At retrial, U.S. Brass will have the burden of apportioning its liability for the plaintiffs' injuries. If U.S. Brass cannot establish its percentage of liability, and thus remains liable for the whole, the trial court should credit U.S. Brass for the amounts the plaintiffs received in settlement from the other joint tortfeasors. *See Riley v. Industrial Fin. Serv. Co.,* 302 S.W.2d 652, 656 (Tex.1957).[2]

## V. CONCLUSION

A defendant's acts must be in connection with the plaintiff's consumer transaction to support liability under the DTPA. As explained above, the homeowners presented no evidence that the conduct of Celanese, Shell, or U.S. Brass was in connection with the purchase of their homes.

We therefore affirm in part and reverse in part the judgments of the courts of appeals. We reverse the courts of appeals' judgments in favor of the plaintiffs on their DTPA claims, and render judgment that these plaintiffs take nothing against Celanese, Shell, or U.S. Brass under the DTPA. We remand *Andraus* and *Kochie* to the trial courts for rendition of judgment for those homeowners who received favorable jury findings on their negligence claims. We reverse the judgment of the court of appeals with respect to res judicata in *Knowlton,* and render judgment in favor of the defendants. We reverse the judgment of the court of appeals with respect to the apportionment of negligence damages in *Barrett,* and remand to the trial court for reapportionment in accordance with the standards described in this opinion.

Except to the extent reversed or modified by this opinion, we affirm the judgments of the courts of appeals.

GONZALEZ and SPECTOR, JJ., concur in part and dissent in part.

OWEN, J., not sitting.

GONZALEZ, Justice, joined by SPECTOR, Justice, concurring in part and dissenting in part.

I concur in the Court's judgment with respect to the plaintiffs' misrepresentation claims under the Deceptive Trade Practices—Consumer Protection Act (DTPA). However, I cannot join the Court's opinion because legally sufficient evidence supports the juries' findings that U.S. Brass engaged in unconscionable conduct. Thus, I would affirm in part and reverse in part the judgments of the court of appeals.

The Legislature has expressed a policy that the DTPA be liberally construed to protect consumers in their dealings with merchants and tradesmen. *See* TEX.BUS. & COM. CODE § 17.44. Consumers are authorized to bring suit not merely for false, misleading, or deceptive acts or practices, *see id.* § 17.50(a)(1), but also for "any unconscionable ... course of action by any person." *Id.* § 17.50(a)(3). An unconscionable course of action includes "tak[ing] advantage of the

2. We note that David and Tammie Love have also brought a point of error complaining of the court of appeals' holding that the statute of limitations barred their negligence claim. Because they did not reurge that complaint in their motion for rehearing before the court of appeals, we cannot consider it. *Smith v. Baldwin,* 611 S.W.2d 611, 618 (Tex.1981); *see* TEX.R.APP.P. 131(e).

lack of knowledge, ability, experience, or capacity of a person to a grossly unfair degree." *Id.* § 17.45(5)(A). To be actionable, the resulting unfairness must be "glaringly noticeable, flagrant, complete and unmitigated." *Kennemore v. Bennett*, 755 S.W.2d 89, 92 (Tex.1988). Whether the defendant commits a misrepresentation or engages in unconscionable conduct, its actions must be taken "in connection with" the transaction forming the basis of the plaintiff's claim. *See, e.g., Home Sav. Ass'n v. Guerra*, 733 S.W.2d 134, 136 (Tex.1987); *Knight v. International Harvester Credit Corp.*, 627 S.W.2d 382, 388–89 (Tex.1982); *Cameron v. Terrell & Garrett, Inc.*, 618 S.W.2d 535, 541 (Tex. 1981).

The "in connection with" requirement properly focuses our view of the evidence on producing cause. A plaintiff must prove the defendant's acts were the producing cause of his damages, but need not establish the existence of privity between the parties. *See Qantel Business Sys., Inc. v. Custom Controls Co.*, 761 S.W.2d 302, 305 (Tex.1988); *Guerra*, 733 S.W.2d at 136. The first component of producing-cause analysis is a purely fact-based examination, considering whether, but for the defendant's conduct, the plaintiff's injuries would not have occurred. *See Prudential Ins. Co. v. Jefferson Assocs., Ltd.*, 896 S.W.2d 156, 161 (Tex.1995). Under the DTPA, a defendant's acts cannot be the producing cause of a plaintiff's injuries unless the injuries flowed from the defendant's misconduct in connection with a consumer transaction. In this instance, there can be no dispute that the plaintiffs' damages flow from the deceptive or unconscionable conduct, satisfying the "but for" component of producing cause.

Producing-cause analysis further includes an inquiry into whether the defendants' conduct was the "legal cause" of the plaintiffs' injuries; that is, whether it was such a substantial factor in causing the plaintiffs' injuries that liability should be imposed. *See Prudential*, 896 S.W.2d at 161. *See generally Union Pump Co. v. Allbritton*, 898 S.W.2d 773, 779–84 (Tex.1995) (Cornyn, J., concurring) (describing development and current status of producing-cause analysis). Policy-

based considerations and "common-sense notions of responsibility" should guide the determination of whether the causal connection between the defendant's acts and the plaintiffs' injuries merits the imposition of DTPA liability. *See* WILLIAM POWERS, JR., TEXAS PRODUCTS LIABILITY LAW § 6.022, at 6–4, 6–20 (2d ed. 1992).

The analysis of legal cause also must be confined to the facts of the particular case, but courts should consider factors deemed significant in other DTPA cases. A non-exclusive list can be distilled from this Court's prior decisions. Such a list would include the following:

(1) the extent to which the defendant benefitted from the overall transaction, *see Flenniken v. Longview Bank & Trust Co.*, 661 S.W.2d 705, 707 (Tex.1983); *Knight*, 627 S.W.2d at 389;

(2) the defendant's control over a product's manufacture, repair, or installation, *see Guerra*, 733 S.W.2d at 136–37; *International Armament Corp. v. King*, 686 S.W.2d 595, 599 (Tex.1985); *Hurst v. Sears, Roebuck & Co.*, 647 S.W.2d 249, 251–52 (Tex.1983);

(3) the defendant's knowledge of and ability to influence the terms of a sale of a product or service to consumers, *see Knight*, 627 S.W.2d at 389; *Cameron*, 618 S.W.2d at 537–39; *Ozuna v. Delaney Realty, Inc.*, 600 S.W.2d 780, 781–82 (Tex.1980);

(4) the defendant's control over the marketing of goods or services, including its intent that its representations be passed on to consumers, and whether they were passed on to them, *see Kennemore*, 755 S.W.2d at 92; *Brown v. Galleria Area Ford, Inc.*, 752 S.W.2d 114, 115–16 (Tex.1988); *Kennedy v. Sale*, 689 S.W.2d 890, 891–93 (Tex. 1985); and

(5) the extent to which intermediaries or the consumer can reasonably make an independent assessment of the characteristics of goods or services, and the extent to which they did, *see Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 481–82 (Tex.1995); *Prudential*, 896 S.W.2d at 161; *Dubow v.*

*Dragon,* 746 S.W.2d 857, 860–61 (Tex. App.—Dallas 1988, no writ).

With these factors in mind, I consider the evidence under the appropriate standard of review, examining it in the light most favorable to the jury verdicts and disregarding all contrary evidence. *See Davis v. City of San Antonio,* 752 S.W.2d 518, 522 (Tex.1988); W. Wendell Hall, *Revisiting Standards of Review in Civil Appeals,* 24 St. Mary's L.J. 1045, 1133 (1993). My review of the record reveals significant distinctions between U.S. Brass's conduct and that of Celanese and Shell, which merely supplied some of the materials U.S. Brass used to manufacture the plumbing system. The record shows that U.S. Brass did the following:

(1) designed and exclusively manufactured the plumbing system at issue;

(2) selected the raw materials used in fabricating the system, including polybutylene resin for the pipe and Celcon compound for the fittings;

(3) ignored Celanese's recommendations that it test fittings made from Celcon in the severest anticipated end-use conditions;

(4) designed and produced the crimping tool used to install the system and the accompanying crimp rings;

(5) made representations to building code officials about the system's suitability despite its failure to test the system's fitness and durability for use under ordinary conditions present in LaPorte homes;

(6) conducted an aggressive sales campaign aimed at the new home market and targeted individual builders for sales of the system;

(7) represented to builders that the polybutylene plumbing system was durable and would last twenty-five years;

(8) depicted the system as easy to install, requiring fewer joints, and as a quality product with characteristics superior to copper, galvanized steel, and PVC plumbing systems;

(9) met with home builders numerous times, touting its system;

(10) provided a catalog on the plumbing system to home builders, which represented that the pipe would not corrode, freeze, or allow mineral build-up and that the fittings would not corrode;

(11) prepared the installation instructions for the system and trained the builders' plumbers and subcontractors on how to install it;

(12) suppressed a report from one of its product development specialists indicating that "enormous problems still needed to be overcome" regarding the system;

(13) ignored the specialist's recommendation that "a serious research and development program" was needed to fix continuing problems with leaks and excessive failure rates in the pipes and fittings, *see* 864 S.W.2d 606, 624; and

(14) rather than acting on these suggestions to mitigate the system's failure rate, told the specialist to destroy the most damming portions of his report, *id.*

Furthermore, but for U.S. Brass's aggressive promotion of its plumbing system, building officials would not have approved its use in subdivision homes and new home builders would not have installed it.

Under the factors I have listed, particularly whether the plaintiffs could reasonably evaluate the product, U.S. Brass's conduct clearly meets the "substantial factor" element of producing cause. The plaintiffs believed the plumbing system installed in their homes was a quality product that at least met building code standards for performance and longevity. They could not have known of, nor did they have the ability, experience, or capacity to detect, the micro-fine cracks in the pipes that would eventually split and burst or the cumulative degradation of the insert fittings that ultimately gave way because of chlorine exposure and stress. *See Kennemore,* 755 S.W.2d at 92 (ruling that defendant acted unconscionably in flagrantly taking advantage of consumers' "lack of knowledge" and inability to correct specific problems). U.S. Brass's conduct caused the

installation of systems that failed miserably, resulting in property damage, diminution in the value of homes, and personal distress to the plaintiff-homeowners. I conclude that more than a scintilla of evidence supports the juries' findings that U.S. Brass took advantage of the new homeowners' lack of knowledge and capacity to evaluate the reliability of their plumbing systems and did so to a grossly unfair degree. *See Brown*, 752 S.W.2d at 116 (holding that defendant "took advantage" of plaintiffs "to a grossly unfair degree" by exploiting their lack of knowledge). In light of the policies animating the DTPA and common-sense notions of responsibility, the jury verdicts imposing liability upon U.S. Brass for unconscionable conduct toward new home buyers should stand.

On the other hand, some purchasers acquired their homes from prior owners by private sale or through foreclosure. U.S. Brass represented the plumbing system's characteristics to the home builders and to building code inspectors, anticipating that it would expand the new-home market for its plumbing system by doing so. However, U.S. Brass's role in connection with the acquisition of homes by subsequent purchasers was far less pronounced. Assuming that U.S. Brass's unconscionable conduct factually caused the presence of the defective plumbing systems in used homes, this connection is too attenuated to merit the imposition of DTPA liability. *See Boys Clubs*, 907 S.W.2d at 481–82.

In summary, more than a scintilla of evidence supports the juries' findings that U.S. Brass acted unconscionably and that its acts were a producing cause of the damages to new homeowners. Therefore, under the facts of these three cases, I would affirm the judgments of the court of appeals to the extent they approved the imposition of DTPA liability upon U.S. Brass for its unconscionable conduct toward new home buyers. *See* TEX.BUS. & COM.CODE §§ 17.45(5)(A), 17.50(a)(3). However, I would reverse the lower court's judgments, as specified by the Court, and render judgment that the plaintiffs take nothing against Celanese, Shell, and U.S. Brass for any alleged DTPA misrepresentations.