

NUMBER 13-16-00293-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

G.T. LEACH BUILDERS, L.L.C.-
RESIDENTIAL, G.T. LEACH
CONSTRUCTION, L.P. AND
GARY T. LEACH,                                                          Appellants,

v.

SAPPHIRE CONDOMINIUMS
ASSOCIATION, INC.,                                                      Appellee.

On appeal from the 138th District Court of
Cameron County, Texas.

# MEMORANDUM OPINION

Before Justices Rodriguez, Contreras, and Longoria
Memorandum Opinion by Justice Longoria

Appellants G.T. Leach Builders, L.L.C.—Residential (G.T. Leach Builders), G.T.

Leach Construction, L.P., and Gary T. Leach (collectively, G.T. Leach), appeal an order

denying their motion to compel arbitration of appellee Sapphire Condominiums Association, Inc.'s lawsuit. We affirm.

## I. BACKGROUND

Sapphire V.P., L.P. (Sapphire V.P.) was a limited partnership in the business of developing a luxury condominium complex on South Padre Island called Sapphire Condominiums. At the beginning of this project, Sapphire V.P. executed a general construction contract (Contract) with appellant G.T. Leach Builders to act as its general contractor. The Contract contained a clause in which the parties agreed to submit to binding arbitration "[a]ny [c]laim arising out of or related to the Contract." The arbitration proceeding would be subject to the provisions of the Texas Arbitration Act (TAA).

G.T. Leach Builders and Sapphire V.P. agreed in section 13.2.1 of the Contract that they bound "themselves, their partners, successors, assigns[,] and legal representatives to the other party hereto and to [the] partners, successors, assigns[,] and legal representatives of such other party . . . in respect to covenants, agreements[,] and obligations in the Contract Documents."

### A. Creation of the Condominium

Sapphire V.P. legally formed Sapphire Condominiums in November 2005 by recording a Residential Declaration (Declaration) in the official records of Cameron County. *See* TEX. PROP. CODE ANN. § 82.051(a) (West, Westlaw through Ch. 49, 2017 R.S.) (setting out the legal requirements of a declaration creating a condominium under the Uniform Condominium Act). The Declaration recited that Sapphire V.P., as the "Residential Declarant," owned the entire complex in fee simple but now subdivided it into fee-simple estates. Each estate was composed of an individual residence and an

2

undivided interest in the common elements. Sapphire V.P. continued to own each estate as the "Residence Owner" under the Declaration until selling the estate to a new owner. Sapphire V.P. retained several rights as the Residential Declarant related to finishing construction of the complex that we explain in detail below.

The Declaration further recited that Sapphire V.P. created a residence association, the Sapphire Condominiums Association (Association), as a Texas nonprofit corporation. The Association was composed of the owners of each individual estate and would be responsible for various tasks related to operating, preserving, and maintaining the condominium complex. Section 82.102 of the Uniform Condominium Act also conferred various powers on the Association unless inconsistent with the Declaration. *See generally id.* § 82.102(a) (West, Westlaw through Ch. 49, 2017 R.S.) (setting out the powers of a condominium unit owners' association).

Under the terms of the Declaration, Sapphire V.P. exercised a period of "residential declarant control" over Sapphire Condominiums beginning on the date the Declaration was filed and ending either three years after the date the first deed to an estate was recorded or 120 days after the deeds to 75% of the residences had been recorded, whichever date came earlier. During this period, Sapphire V.P. possessed the right under the Declaration to appoint the Association's board of directors.

## B. Damage from Hurricane Dolly

While construction was still ongoing, Hurricane Dolly caused extensive damage to Sapphire Condominiums. Sapphire V.P. filed suit against its insurance brokers alleging they allowed its builder's risk policy to expire several days before the storm and be replaced by a permanent policy. Sapphire V.P. sought to recover millions of dollars in

damages from the storm that were allegedly uncovered by the permanent policy but would have been covered under the builder's risk policy. *G.T. Leach Builders, L.L.C. v. Sapphire, VP, LP*, 456 S.W.3d 570, 574 (Tex. App.—Corpus Christi 2013) *aff'd in part, rev'd in part,* 458 S.W.3d 502 (Tex. 2015) (*G.T. Leach Builders I*).

Sapphire V.P. later added as defendants appellant G.T. Leach Builders, two of its subcontractors, an engineering contractor, and one of the engineering contractor's employees. *Id.* Sapphire V.P. alleged that these defendants' negligence and contractual breaches resulted in construction defects which caused the complex to sustain water damage from the storm leading to the uncovered losses. *Id.* G.T. Leach Builders filed a motion to compel arbitration under the arbitration clause in the Contract. The other defendants filed similar motions even though none of them were signatories to the Contract. *Id.* at 575. The trial court denied all of the defendants' motions to compel.

The defendants appealed to this Court. Sapphire V.P. did not dispute an enforceable agreement to arbitrate existed but raised the affirmative defenses of statute of limitations and waiver. *Id.* at 577. This Court agreed that the statute of limitations barred arbitration and did not reach the waiver issue. *Id.* at 578–79. This Court rejected the arguments of the non-signatory defendants that the Contract gave them the right to compel arbitration or that Sapphire V.P. was equitably estopped from denying arbitration. *Id.* at 580–85. The Texas Supreme Court reversed in part, rejecting both of Sapphire V.P.'s affirmative defenses, and ordered it to arbitrate its claims against G.T. Leach Builders. *G.T. Leach Builders, LLC v. Sapphire V.P., LP*, 458 S.W.3d 502, 511–23 (Tex. 2015) (*G.T. Leach Builders II*). The Court affirmed the denial of the other defendants' motions to compel arbitration. *Id.* at 523–32.

4

## C. The Association's Lawsuit

After the end of Sapphire V.P.'s period of declarant control, the individual residence owners gained the right under the Declaration to elect the Association's board of directors. The Association, acting through an elected board of directors, filed suit in August 2015 against appellants G.T. Leach, Sapphire V.P.,[1] and multiple other defendants involved with developing and constructing Sapphire Condominiums. The Association alleged claims against Sapphire V.P. and G.T. Leach for negligence, negligence per se, breach of implied warranties, breach of fiduciary duty, negligent misrepresentation, and various violations of the Texas Deceptive Trade Practices Act (DTPA).

G.T. Leach filed a motion seeking to compel the Association to arbitrate pursuant to the arbitration clause in the Contract.[2] G.T. Leach acknowledged the Association did not sign the Contract but pointed out that the Contract bound the "partners, successors, assigns[,] and legal representatives" of either party "in respect to covenants, agreements[,] and obligations contained in the Contract Documents." In its motion, G.T. Leach contended that the Association qualified as either an assignee or successor of Sapphire V.P. The Association responded that it was neither an assignee nor a successor and that its claims against G.T. Leach do not arise from or relate to the Contract.

---

[1] The record reflects that the Texas Secretary of State ordered Sapphire V.P.'s corporate charter forfeited pursuant to the Tax Code on August 1, 2014, and there is no indication that it has been reinstated. *See* TEX. TAX CODE ANN. §§ 171.302, 171.309 (West, Westlaw through Ch. 49, 2017 R.S.).

[2] Appellants G.T. Leach Construction and Gary T. Leach are not signatories to the Contract. "As a general rule, an arbitration clause cannot be invoked by a non-party to the arbitration contract." *G.T. Leach Builders II*, 458 S.W.3d at 524 (internal quotation marks omitted). A non-signatory must establish that they have a valid legal right to enforce an arbitration agreement even though they are not a party. *Id.* The Association nevertheless treats all three defendants as a party to the Contract with the right to invoke the arbitration clause. For purposes of this opinion, we do the same.

5

The trial court denied G.T. Leach's motion to compel without explaining its reasons. G.T. Leach subsequently filed a combined motion seeking a stay of trial proceedings pending appeal and a protective order relieving it from the obligation to respond to discovery. The trial court also denied that motion. G.T. Leach timely brought this interlocutory appeal. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 171.098(a)(1) (West, Westlaw through Ch. 49, 2017 R.S.) (permitting an interlocutory appeal of a judgment or decree denying an application to compel arbitration under the TAA). This Court stayed all trial court proceedings pending resolution of this appeal of the denial of G.T. Leach's motion.

G.T. Leach argues in two issues that: (1) G.T. Leach met its burden under the TAA to compel the Association to arbitration and (2) the trial court abused its discretion in refusing to stay all trial proceedings pending appeal.

## II. STANDARD OF REVIEW AND APPLICABLE LAW

We review a court's decision on a motion to compel arbitration for an abuse of discretion. *Beldon Roofing Co. v. Sunchase IV Homeowners' Ass'n, Inc.*, 494 S.W.3d 231, 238 (Tex. App.—Corpus Christi 2015, no pet.). Under this standard, we review questions of law *de novo* but factual determinations under a no-evidence standard of review. *In re Labatt Food Serv., L.P.*, 279 S.W.3d 640, 643 (Tex. 2009) (orig. proceeding).

Under the TAA, a court must compel arbitration on application of a party showing an agreement to arbitrate and the refusal of the other party to arbitrate. TEX. CIV. PRAC. & REM. CODE ANN. § 171.021(a) (West, Westlaw through Ch. 49, 2017 R.S.). As a threshold matter, the party seeking to compel arbitration must establish both (1) the existence of a valid arbitration agreement; and (2) a dispute within the scope of the

6

agreement.  *Rachal v. Reitz*, 403 S.W.3d 840, 843 (Tex. 2013).  Once a court finds an enforceable arbitration agreement, a "strong presumption" favoring arbitration arises "such that myriad doubts—as to waiver, scope, and other issues not relating to enforceability—must be resolved in favor of arbitration."[3]  *In re Poly-Am., L.P.*, 262 S.W.3d 337, 348 (Tex. 2008) (orig. proceeding).

Courts determine whether an enforceable agreement to arbitrate exists by applying "ordinary principles of state contract law."  *G.T. Leach Builders II*, 458 S.W.3d at 524.  Generally, "parties must sign arbitration agreements before being bound by them."  *Id.* (quoting *In re Rubiola*, 334 S.W.3d 220, 224 (Tex. 2011) (orig. proceeding)).  But the question of who is actually bound by an arbitration agreement is essentially "a function of the intent of the parties, as expressed in the terms of the agreement."  *In re Rubiola*, 334 S.W.3d at 224 (quoting *Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d 347, 355 (5th Cir. 2003)).  We make this determination by interpreting the agreement as a whole in accord with the plain and ordinary meaning of the language the parties chose to use in the document.  *Great Am. Ins. Co. v. Primo*, 512 S.W.3d 890, 892 (Tex. 2017).  "And we assign terms their ordinary and generally accepted meaning unless the contract directs otherwise."  *Id.* at 893.  Whether an agreement to arbitrate is enforceable is a question of law that we review *de novo*.  *Rachal*, 403 S.W.3d at 843.

---

[3] G.T. Leach asserts in its brief that we should apply a presumption favoring arbitration in determining whether an agreement to arbitrate exists.  We reject this argument because the Texas Supreme Court has been clear that the presumption favoring arbitration "arises only after the party seeking to compel arbitration proves that a valid arbitration agreement exists."  *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 737 (Tex. 2005) (orig. proceeding) (quoting *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 227 (Tex. 2003)); *see In re Poly-Am., L.P.*, 262 S.W.3d 337, 348 (Tex. 2008) (orig. proceeding).

### III. NO ENFORCEABLE AGREEMENT TO ARBITRATE

G.T. Leach asserts in its first issues that the trial court wrongfully concluded that no enforceable agreement existed between G.T. Leach and the Association because the Association is the "successor" or the "assign" of Sapphire V.P. G.T. Leach contends that the Association's status resolves this case because the Texas Supreme Court decided in *G.T. Leach Builders II* that the arbitration clause is valid and enforceable between G.T. Leach Builders and Sapphire V.P. The Association does not contest that it would be bound by the Contract if it qualifies as an "assign" or "successor" of Sapphire V.P. but contends that it does not qualify as either.

The Contract states that G.T. Leach Builders and Sapphire V.P. intended to bind their "assigns" and "successors" to the Contract's "covenants, agreements[,] and obligations." The natural meaning of this language is that an entity which qualifies as either an assign or a successor is bound to the entire Contract, including the arbitration clause. *See Primo*, 512 S.W.3d at 892. After considering the ordinary meaning of both terms, we agree that the Association does not qualify as an assign or successor of Sapphire V.P.

**A. "Assign"**

We begin with the dictionary definition of the word. *See Epps v. Fowler*, 351 S.W.3d 862, 866 (Tex. 2011). Webster's defines an "assignee," the alternative form of "assign," as a "person to whom a right or property is legally transferred." *Assignee*, MERRIAM WEBSTER'S COLLEGIATE DICTIONARY (10th ed. 1996). Black's Law Dictionary defines the term as "[s]omeone to whom property rights or powers are transferred by another." *Assignee*, BLACK'S LAW DICTIONARY (10th ed. 2014). The Contract appears to

8

use the term in the same way. Another sentence, for example, allows Sapphire V.P. to "assign" the Contract to a lender providing funding for the project and provides for the lender—who would be the "assign" under the previous clause—to assume Sapphire V.P.'s rights and obligations.

Applying this definition, we conclude there is no evidence of a transfer to the Association of Sapphire V.P.'s rights and obligations under the Contract. "An assignment is construed to have been made when the owner of a right manifests its intention to transfer the right to an assignee." *Weaver & Tidwell, L.L.P. v. Guarantee Co. of N. Am. USA*, 427 S.W.3d 559, 570 (Tex. App.—Dallas 2014, pet. denied). G.T. Leach asserts that the Association qualifies as an assignee because Sapphire V.P. owned all of the residences during construction of Sapphire Condominiums and so "was the Association" during that time. Therefore, any rights or remedies the current Association could bring on behalf of its members must come by assignment from Sapphire V.P. As evidence, G.T. Leach points to the Association's claims for breach of implied warranties and for attorneys' fees. According to G.T. Leach, the Association cannot bring either claim unless Sapphire V.P. assigned some of its rights under the Contract. We disagree.

G.T. Leach first contends that the Association's claim for breach of implied warranties under the DTPA relates to warranties G.T. Leach allegedly made to Sapphire V.P. regarding the status of the residences. Under *Gupta v. Ritter Homes, Inc.*, a claim for breach of those warranties is "automatically assigned" to the subsequent purchasers. 646 S.W.2d 168, 169 (Tex. 1983). G.T. Leach argues that a DTPA claim therefore belongs to the subsequent purchasers here: the individual estate owners, which are represented by the Association. We disagree because the Texas Supreme Court later

9

overruled *Gupta.* In *Amstadt v. U.S. Brass Corp.*, the Court held that DTPA laundry-list and unconscionability claims could not be brought by subsequent purchasers against upstream entities whose deceptive conduct was not part of the plaintiff's consumer transaction. 919 S.W.2d 644, 649 (Tex. 1996). *Amstadt* did not involve implied warranty claims, but the Court later extended it to such claims, recognizing that *Amstadt* "appears to overrule *Gupta v. Ritter Homes, Inc.,* in which we held an implied warranty asserted under the DTPA could be brought by a subsequent purchaser." *PPG Indus., Inc. v. JMB/Houston Centers Partners Ltd. P'ship*, 146 S.W.3d 79, 86 n. 27 (Tex. 2004). Under *PPG Industries*, any implied warranties by G.T. Leach to Sapphire V.P. were not automatically assigned to the Association.

G.T. Leach's argument regarding the Association's claim for attorneys' fees under section 38.001 of the Texas Civil Practice and Remedies Code is also unpersuasive. Section 38.001 allows a party to recover reasonable attorneys' fees for several types of claims, including for "an oral or written contract." TEX. CIV. PRAC. & REM. CODE ANN. § 38.001(8) (West, Westlaw through Ch. 49, 2017 R.S.). G.T. Leach asserts that this claim means that the Association must be in privity with G.T. Leach on the Contract. The Association's claim for attorneys' fees might be an indication that its claims are on a contract of some sort, but G.T. Leach does not explain how the Association's claim for attorneys' fees demonstrates that Sapphire V.P. transferred any of its rights or obligations under the Contract to the Association. On this record, the Association's claim for attorneys' fees under section 38.001 is not evidence of an assignment of Sapphire V.P.'s rights under the Contract.

10

G.T. Leach has not presented any evidence that Sapphire V.P. transferred any of its rights or obligations under the Contract to the Association. We conclude as a result that the Association does not qualify as an "assign" of Sapphire V.P.

**B. "Successor"**

Black's Law Dictionary defines a successor as "[s]omeone who succeeds to the office, rights, responsibilities or place of another; one who replaces or follows a predecessor." *Successor*, BLACK'S LAW DICTIONARY (10th ed. 2014).[4] As applied to a corporation, a successor refers more narrowly to "[a] corporation that, through amalgamation, consolidation, or other assumption of interests, is vested with the rights and duties of an earlier corporation." *Id.*; *see Rogers v. RREF II CB Acquisitions, LLC*, No. 13-15-00321-CV, ___ S.W.3d ___, ___, 2016 WL 6804451, at *11 n.4 (Tex. App.—Corpus Christi Nov. 17, 2016, no pet.) (citing essentially the same definition). G.T. Leach asks us to adopt a more expansive definition of the term as "one who takes the place which another has left, and sustains the like part or character." *Enchanted Estates Cmty. Ass'n, Inc. v. Timberlake Imp. Dist.*, 832 S.W.2d 800, 802 (Tex. App.—Houston [1st Dist.] 1992, no writ). The Association responds that we should apply the more narrow definition as applied to corporations. Neither party addresses which definition of a successor is supported by the Contract's text. We need not settle on a definitive interpretation because we conclude the Association is not a successor to Sapphire V.P. under either of the definitions advanced by the parties.

Regarding the Association's definition, there is no evidence that it succeeded Sapphire V.P. through amalgamation, consolidation, or another assumption of corporate

---

[4] Webster's defines a successor simply as "one that follows," especially "one who succeeds to a throne, title, estate, or office." *Successor*, MERRIAM WEBSTER'S COLLEGIATE DICTIONARY (10th ed. 1996).

11

interests. To the contrary, Sapphire V.P. continued to exist until the forfeiture of its charter on August 1, 2014. G.T. Leach has not shown any evidence that the Association assumed any of Sapphire V.P's rights or interests following its forfeiture.

We reach the same result if we adopt G.T. Leach's wider definition of a successor as "one who takes the place which another has left, and sustains the like part or character." *See id.* G.T. Leach argues that the Association became Sapphire V.P's successor because the owners of the individual residences and the Association itself collectively represent Sapphire V.P.'s entire interest in Sapphire Condominiums. It argues that in this way, the Association stepped into the shoes of Sapphire V.P. as both the "Residence Owner" and "Residential Declarant" under the Declaration. The Association replies that it did not succeed to Sapphire V.P.'s role under the Contract and does not own the complex in the same way as Sapphire V.P. We agree with the Association.

Sapphire V.P. had two roles under the Declaration: the "Residence Owner" of each estate and the "Residential Declarant." Even after Sapphire V.P. sold enough residences that it ceded control of the Association's board of directors, Sapphire V.P. retained authority as the Residential Declarant to finish construction of Sapphire Condominiums. The Declaration reserved for Sapphire V.P. the rights to "complete the Improvements shown on the Residential Map," "to conduct any activity or operations on or in connection with the Residential Condominium that Residential Declarant determines to be necessary or advisable in connection with the completion of the development of the Residential Condominium," and several other rights related to construction. In contrast, nothing in the Declaration or the Uniform Condominium Act gives the Association the right

12

to finish construction. More importantly, nothing in the Contract provides that the Association would take over Sapphire V.P.'s rights and obligations under the Contract.

G.T. Leach contends that the Association is nevertheless the "successor" to Sapphire V.P. because it represents all of Sapphire V.P.'s interest in Sapphire Condominiums. We do not agree because the Association does not own Sapphire Condominiums in the same way as Sapphire V.P. The Association has authority to manage the complex and to represent two or more of the owners in litigation on matters affecting the condominium, but that authority is not the same as ownership. Ownership of the estates and the attendant obligations remain with the individual owners. The Association does not own Sapphire Condominiums in fee simple and has not taken on any of the obligations associated with ownership. G.T. Leach disagrees, arguing that the Association succeeded to Sapphire V.P.'s ownership through section 2.1(c) of the Declaration, which states that upon filing of the Declaration

> and acceptance of a deed to a Residence, any and all obligations (including the obligations to pay Assessments as provided in the Master Declaration), liabilities, limitations, rights, waivers, benefits or burdens that are vested or that may in the future become vested in or upon the Residential Declarant in relation to the Residence, pursuant to the Master Declaration are hereby assumed . . .

In its brief, G.T. Leach follows the above section with an ellipsis and the phrase "by the residence owners and the Association" within the block quote. But the part of section 2.1(c) immediately after "assumed" in the block quote above reads:

> by such Residence Owners and Residential Declarant, with respect to Residences retained by Residential Declarant, until Residential Declarant sells such Residences to other Residence Owners, and shall automatically be the obligations (including the obligations to pay Assessments as defined in the Master Declaration), liabilities, limitations, rights, waivers, benefits or burdens of the Residence Owners (including Residential Declarant, as applicable) . . . .

13

The plain meaning of this wording vests the "liabilities, limitations, rights, waivers, benefits or burdens" regarding an individual residence in the owner rather than the Association. Assuming that G.T. Leach is correct that section 2.1(c) necessarily transferred Sapphire V.P.'s rights and obligations under the Contract to the Residence Owners, the Association did not acquire any of those rights and obligations.

Whether it is Sapphire V.P.'s role under the Contract or its role as the residential declarant, the Association may have taken some of Sapphire V.P.'s place in the complex, but it has not maintained the same part or character. *See Augusta Court Co-Owners' Ass'n v. Levin, Roth & Kasner*, 971 S.W.2d 119, 126 (Tex. App.—Houston [14th Dist.] 1998, pet. denied) (holding that a residents' association was not a "successor" under the same expansive definition "because it never owned the entire development and never assumed any of the obligations associated with such ownership"). We conclude the Association does not qualify as a successor of Sapphire V.P.

## C. Summary

Under the facts of this case, we conclude that the trial court did not abuse its discretion when it concluded that the Association is not an "assign" or a "successor" of Sapphire V.P. As a result, we hold that the arbitration clause is not enforceable against the Association because it is not a signatory to the Contract.[5] We do not consider the

---

[5] G.T. Leach asserts in a footnote that the Association should be equitably estopped from denying the arbitration clause because it seeks to derive a direct benefit from the Contract. Under principles of equitable estoppel, a litigant who sues based on a contract subjects himself to the contract's terms, including any arbitration agreement. *See In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 755–56 (Tex. 2001) (orig. proceeding). We do not address this issue because G.T. Leach did not present it to the trial court and so has not preserved error. *See* TEX. R. APP. P. 33.1; *see also Ewing v. Act Catastrophe-Tex. L.C.*, 375 S.W.3d 545, 549 (Tex. App.—Houston [14th Dist.] 2012, pet. denied).

scope of the arbitration clause because our holding makes it unnecessary. *See Rachal*, 403 S.W.3d at 843; *see also* TEX. R. APP. P. 47.1. We overrule G.T. Leach's first issue.

## IV. RIGHT TO A STAY

G.T. Leach asserts in its second issue that the trial court should have granted its application for a stay because all claims against it should have been ordered to arbitration. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 171.021(c) (requiring an order compelling arbitration to "include a stay of any proceeding subject to Section 171.025"); 171.025 (requiring a court to stay any "proceeding that involves an issue subject to arbitration if an order for arbitration or an application for that order is made") (West, Westlaw through Ch. 49, 2017 R.S.).

We do not address this issue to the extent that it asks us to instruct the trial court to impose a stay during arbitration because we have already held that arbitration was not required. *See* TEX. R. APP. P. 47.1. In the alternative, G.T. Leach requests "an extension of the stay required under [s]ection 171.025," or of the stay imposed by this Court, until G.T. Leach exhausts it right to appeal to the Texas Supreme Court. We reject both requests. The plain language of section 171.025 addresses a stay once an order for arbitration or an application for such an order has been made. TEX. CIV. PRAC. & REM. CODE ANN. § 171.025. G.T. Leach does not explain how the language of section 171.025 includes a stay after the court denies a stay for arbitration, and we decline to interpret section 171.025 in this way without additional briefing. *See id.* Furthermore, we deny G.T. Leach's request to extend the stay we imposed at the beginning of this appeal. We overrule G.T. Leach's second issue.

## V. Conclusion

We affirm the trial court's order denying G.T. Leach's motion to compel arbitration.

We lift the stay imposed by our order of June 23, 2016.

NORA L. LONGORIA
Justice

Delivered and filed the
3rd day of August, 2017.