**Michael Joseph McGEE, Appellant,**

**v.**

**Linda Diane McGEE, Individually and as Natural Parent and Next Friend of John Deston Bardin, Jr., Appellee.**

No. 10–96–031–CV.

Court of Appeals of Texas,
Waco.

Nov. 6, 1996.

Opinion Denying Rehearing Jan. 15, 1997.

Michael L. Scanes, Keith C. Cameron, Naman, Howell, Smith & Lee, P.C., Waco, for appellant.

David D. Deaconson, Pakis, Giotes, Beard & Page, P.C., Waco, for appellee.

Before DAVIS, C.J., and CUMMINGS and VANCE, JJ.

## OPINION

VANCE, Justice.

We must decide whether there is any evidence that a stepfather, who has abused his stepson, sexually and otherwise, acted negligently in some respects as opposed to intentionally in all respects. The distinction is important because homeowner's insurance may provide coverage for negligent acts but not intentional acts. We also address the effect of an agreement whereby the natural mother has indemnified the stepfather against having to personally pay the stepson's claims.

We determine that the court properly rejected a claim of res judicata. Although we find that the jury had the right to decide that some of the acts were negligent, the doctrine of parental immunity applies, so we must reform the judgment. As reformed, the judgment will be affirmed.

Linda Diane McGee (Diane) was married to Michael Joseph McGee (Michael) for sixteen years. She had a son, John Deston Bardin, Jr. (John), by a prior marriage. John's father had died two months before his birth, and Michael was his only "father-figure." After Diane and Michael divorced, she sued him for damages for assaulting John,

negligence, and gross negligence.[1] She initially filed suit individually and as natural parent and next friend of John, who became a party in his own right when he turned eighteen. The acts alleged, which are largely uncontroverted because Michael asserted his Fifth Amendment rights, are so egregious that we will not recite the details. It is sufficient to say that they began when John was five or six years of age and involved sexual abuse, providing him with alcohol, showing him magazines and videotapes of a pornographic nature, and committing acts of self-gratification in his presence.

Diane withdrew her claims before the case was submitted to the jury, which found: (1) Michael assaulted John; (2) John suffered damages of $20,000 for mental anguish and medical care as a result of the assaults; (3) Michael's negligence was the proximate cause of injuries to John; (4) John sustained $50,000 in damages for mental anguish and medical care resulting from the negligence; (5) Michael acted with gross negligence; and (6) $105,000 should be awarded as punitive damages. The court entered judgment consistent with the findings.

In the prior divorce case, Diane and Michael had signed an agreement acknowledging that she and John had claims against Michael that were to be prosecuted later. By that agreement, Diane agreed to hold Michael harmless from liability on any judgment that she or John might recover that was not covered by insurance.[2] She further agreed not to enforce any such judgment against Michael "through process, turnover orders, garnishments, or other writ or process of every type or character and every type of court proceeding." Although the agreement recites that she had "full capacity to engage in this Agreement ... both on behalf of herself and on behalf of John Deston Bardin, Jr.," Diane signed it only in her individual capacity. Michael filed a counterclaim against both Diane and John to enforce the agreement, but the court found that it did not bar John's claims and failed to otherwise enforce it.

Michael appeals from the adverse judgment. His points assert: (1) the agreement made when he and Diane divorced was binding on John and bars this suit; (2) the evidence is legally insufficient to support the jury's finding of negligence and gross negligence and thus the court's judgment; (3) parental immunity bars John's negligence claims; and (4) the court erred in failing to make findings and enter judgment on his counterclaim for a declaratory judgment about the effect of the indemnity agreement. We disagree that the prior agreement bars John's claims and find the evidence legally sufficient, and we will overrule those points. We will, however, sustain the point concerning parental immunity and reform the judgment to delete the damages attributed to Michael's negligence.

Prior to discussing the points we must say that several aspects of this case are disconcerting. Because of Diane's prior agreement, the rights that our decision will affect are effectively those of an insurance company and John—both of whom are innocent. The acts that John complains of, without question, occurred. We observe, however, that no criminal charges were filed against Michael and the record is full of references to Diane's and John's attempts to frame Michael's acts as negligent rather than intentional conduct so as to recover under Michael's homeowner's policy.[3] Nevertheless,

1. From the outset, we must express some reservations about the posture of this case, as all of Michael's conduct towards John was "intentional." See Childers v. A.S., 909 S.W.2d 282, 292 (Tex.App.—Fort Worth 1995, no writ) ("artful attempts ... to plead intentional torts as negligence causes of action"). Our decision will turn on whether Michael intended to harm John, not whether he acted intentionally.

2. We note the irony of a mother indemnifying the abuser of her child against having to pay damages to that child unless there is insurance to cover them.

3. The posture in which the parties have placed the litigation makes us question the public-policy considerations that allow agreements designed to facilitate insurance coverage while allowing the insured to effectively escape liability. We are mindful of State Farm Fire & Casualty Co. v. Gandy, where the Supreme Court declared an agreement to assign a bad-faith claim to a stepdaughter to be violative of public policy. 925 S.W.2d 696 (Tex.1996) (discussion of agreements used to alter the relationship between the claimant, the insured, and the insurance company).

we will do our best to follow the prior decisions of our Supreme Court with the hope that the rights of the parties will ultimately be determined by that Court.

Given these circumstances, our decision about intent or negligence could lead to one of two equally untenable results. One alternative is to infer Michaels's intent to harm John as a matter of law and hold that all of his conduct was intentional. As will be seen, we do not believe that the precedents we must follow permit that course. The other alternative is to uphold the jury's findings that a stepparent can be negligent in providing alcohol and other materials to his stepchild. This result increases the risk of opening the door to future lawsuits by children who believe that they have somehow suffered at the hands of a parent or stepparent. Although we believe that current law dictates the latter course, we also believe that the doctrine of parental immunity protects parents and most stepparents against the plethora of lawsuits that we otherwise fear.

### RES JUDICATA

Michael's first point asserts that John's claims are barred by the agreement that was reached at the time of his divorce from Diane.

▮ Res judicata is the generic term for a group of related concepts concerning the conclusive effects given final judgments. *Barr v. Resolution Trust Corp.*, 837 S.W.2d 627, 628 (Tex.1992). Within the doctrine, there are two principle categories: (1) claim preclusion (also known as res judicata); and (2) issue preclusion (also known as collateral estoppel). *Id.* Claims preclusion prevents the relitigation of a claim or cause of action that has been finally adjudicated, as well as related matters that, with the use of diligence, should have been litigated in the prior suit. *Id.* Issue preclusion prevents relitigation of particular issues already resolved in a prior suit. *Id.* The elements of claims preclusion, or res judicata, are: (1) a prior final judgment on the merits by a court of competent jurisdiction; (2) identity of parties

or those in privity with them; and (3) a second action based on the same claims as were raised or could have been raised in the first action. *Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 652 (Tex.1996). Generally, people are not bound by a judgment in a suit to which they were not parties. *Id.* The doctrine of res judicata creates an exception to this rule by forbidding a second suit arising out of the same subject matter of an earlier suit by those in privity with the parties to the original suit. *Id.* at 652–53.

▮ People can be in privity in at least three ways: (1) they can control an action even if they are not parties to it; (2) their interests can be represented by a party to the action; or (3) they can be successors in interest, deriving their claims through a party to the prior action. *Id.* at 653. To determine whether later plaintiffs are in privity with prior plaintiffs we examine the interests the parties shared. *Id.* Privity exists if the parties share an identity of interests in the basic legal right that is the subject of litigation. *Id.* To determine whether a prior suit and one under review involve the same basic subject matter, we focus on the factual basis of the complaint. *Id.* If the second plaintiffs seek to relitigate the matter which was the subject of the earlier litigation, res judicata bars the suit even if the second plaintiffs do not allege causes of action identical to those asserted by the first. *Id.* Res judicata also precludes a second action on claims that arise out of the same subject matter and which might have been litigated in the first suit. *Id.*

▮ Applying these principles to Michael's claim of res judicata, we find that it fails because John was not a party to the prior divorce case, nor was he in privity with Diane, who was a party to the divorce case and to the agreement.[4] *See id.* Not only is the "basic subject matter" in this case wholly different from that involved in the divorce case, the agreement actually preserved John's claims for future litigation. *See id.*

Michael asserts, without authority, that John ratified the agreement during his testi-

---

Neither party has presented a *Gandy* argument to this court.

4. Although Diane's claims might be affected, they were not submitted to the jury.

mony at trial. We have reviewed the statement of facts on this point, and we disagree. Point one is overruled.

## LEGALLY–INSUFFICIENT EVIDENCE

In points two and three, Michael says that the evidence is legally insufficient to support the jury's findings of negligence and gross negligence, and thus to support the court's judgment, because all of the bad acts John alleges were, as a matter of law, intentional rather than negligent.[5]

■■■ When the complaining party raises a "no-evidence" point challenging the legal sufficiency of the evidence to support a finding that favors the party who had the burden of proof on that finding, the reviewing court must sustain the finding if, considering only that evidence and the inferences which support the finding in the light most favorable to the finding and disregarding evidence and inferences to the contrary, any probative evidence supports it. *Browning–Ferris, Inc. v. Reyna,* 865 S.W.2d 925, 928 (Tex.1993). If there is more than a scintilla of evidence to support the finding, the no-evidence challenge fails. *Id.* "When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of [the fact's] existence, the evidence is no more than a scintilla and, in legal effect, is no evidence." *Heldenfels Bros., Inc. v. City of Corpus Christi,* 832 S.W.2d 39, 41 (Tex. 1992).

The jury found that Michael had assaulted John and awarded him damages for that intentional conduct. Michael does not complain of that part of the judgment. The punitive-damages question was conditioned on an affirmative finding of either intentional conduct or gross negligence. Because Michael does not attack the affirmative finding of intentional conduct, the punitive damages will stand. Thus, regardless of our decision, John will recover judgment for the actual

damages and punitive damages that the jury awarded for the intentional torts.

■■■ The Texas Supreme Court has decided that there is no general duty not to negligently inflict emotional distress. *Boyles v. Kerr,* 855 S.W.2d 593, 594 (Tex.1993). Thus, John has no claim for negligent infliction of emotional distress. *Boyles* does not, however, affect a claimant's right to recover mental anguish damages caused by a defendant's breach of some other legal duty. *Id.* at 597. Because John became addicted to alcohol and drugs, which resulted in medical expenses for hospitalization and treatment, the negligence he claims resulted in damages beyond mental anguish. Thus, *Boyles* does not bar his claim. *See id.*

Michael argues that all of the supposedly negligent acts, including providing alcohol to John, showing him objectionable materials, and performing sexual acts in his presence were so intertwined with the assaultive conduct as to be intentional acts. John agrees that the assaults were intentional, but he argues that the evidence of Michael's (a) indiscriminate watching of sexually-explicit videos, (b) acts of self-gratification in front of John, and (c) making alcoholic beverages available to John were negligent acts, distinguishable from the intentional acts that constituted assaults. His brief urges us to approve the negligence finding because of negligent acts "separate and apart" from the acts of sexual molestation. Having examined the entire record, we agree with Michael that many of the non-contact acts were simultaneous with and thus closely connected with the assaults and should be considered as a part thereof.[6]

■■■ The record reveals that some acts were, as John asserts, "separate and apart" from the sexual misconduct. With respect to those separate acts, our decision turns on whether we must, as a matter of law, infer that Michael intended to injure John. The fundamental difference between negligent in-

---

5. Michael does not assert factual insufficiency points nor does he question causation. We address the sufficiency of the evidence to support the negligence findings in the event we are wrong about parental immunity.

6. The majority of the actual damages that the jury awarded were for the negligent acts. We believe that the reason for that is that John presented his case in such a way as to maximize his recovery under the insurance policy.

jury or grossly negligent injury and intentional injury is the specific intent to inflict injury. *Reed Tool Co. v. Copelin,* 689 S.W.2d 404, 406 (Tex.1985). Intent means that "the actor desires to cause consequences of his act, or that he believes that the consequences are substantially certain to result from it." *Id.* (quoting RESTATEMENT (SECOND) OF TORTS § 8A (1965)).

We find *State Farm Fire & Cas. Co. v. S.S.* to be instructive on the question of when intent to harm will be inferred. 858 S.W.2d 374 (Tex.1993). In *State Farm,* the trial court had granted a summary judgment in favor of the insurance company declaring that a homeowner's policy did not provide coverage for certain claims asserted against its insured. *Id.* at 375. Those claims arose out of consensual sexual activity that resulted in the claimant's being infected with genital herpes. *Id.* The issue before the Supreme Court was whether, as a matter of law, the transmission of genital herpes was an intentional injury which came within the "intentional injury exclusion" of the homeowner's policy such that the claim was not covered. *Id.* at 376. The Court focused on whether an issue of material fact existed about whether the insured knew at that time with substantial certainty that he would transmit herpes to the claimant. *Id.* at 379. Because it determined that such an issue of fact did exist, the summary judgment was reversed. *Id.*

The Court addressed State Farm's contention that, even if the insured did not intend to injure the claimant by his conduct, his intent to injure her should be inferred as a matter of law:

> Jurisdictions which infer intent in sexual misconduct cases usually do so only in instances of sexual misconduct with minors or forcible sex acts between adults. [Footnote omitted.] Those jurisdictions reason that intent to injure may be inferred only when the character of an act is such that the "degree of certainty that the conduct will cause injury is sufficiently great to justify inferring intent to injure as a matter of law." *Loveridge v. Chartier,* 161 Wis.2d 150, 468 N.W.2d 146, 151 (1991);

*see also Woida v. North Star Mut. Ins. Co.,* 306 N.W.2d 570, 573 (Minn.1981) (inferring intent when the actions were of a calculated nature); *Milbank Ins. Co. v. B.L.G. & M.M.D.,* 484 N.W.2d 52, 58 (Minn.Ct.App.1992) (refusing to address inferred intent without a finding that the defendant engaged in sexual conduct knowing it was highly certain that he would infect the plaintiff). However, "[t]here is no bright-line rule to determine when intent to injure should be inferred as a matter of law. Rather, each set of facts: 'must be considered on a case-by-case basis; the more likely harm is to result from certain intentional conduct, the more likely intent to harm may be inferred as a matter of law.'" *Loveridge v. Chartier,* 468 N.W.2d at 151 (quoting *K.A.G. v. Stanford,* 148 Wis.2d 158, 434 N.W.2d 790, 793 (Ct. App.1988)).

*Id.*

State Farm reasserts the rule that whether a person intends to injure another person is ordinarily a question of fact uniquely within the realm of the factfinder. *Id.* at 378. Each case is to be considered on its individual facts—there is no bright-line rule. *Id.* at 379. A guiding principle is: the more likely harm is to result from certain intentional conduct, the more likely intent to harm may be inferred as a matter of law. *Id.* When there is sexual misconduct with a minor, intent to harm should be inferred. *Id.*

To the extent that the jury found other acts committed by Michael that were not intertwined with the sexual misconduct, the court's charge allowed the jury to determine that those acts were unreasonable under the circumstances and were acts of negligence. The charge also allowed the jury to award damages accordingly. Separating the intentional acts from the negligent acts was a task that we understand to be assigned to the jury by the *State Farm* opinion. *Id.* at 378. The standard of review requires us to uphold the jury's finding if the record contains more than a scintilla of evidence to support it.[7] *Browning–Ferris,* 865 S.W.2d at

---

7. Again, we ordinarily would not review the suf-

ficiency of the evidence of negligence that is

928. We believe there is some probative evidence of acts that occurred independently of the assaults—specifically those in providing alcohol and objectionable materials to John—to support the jury's finding that Michael was negligent. We overrule points two and three.

### PARENTAL IMMUNITY

Michael's fourth point asserts that the doctrine of parental immunity bars John's negligence claims. Two questions are presented: (1) to what types of conduct does the doctrine apply; and (2) should the doctrine protect stepparents?

■ For much of this century the doctrine of parental immunity absolutely protected parents from suits by their minor children. *Felderhoff v. Felderhoff,* 473 S.W.2d 928, 930 (Tex.1971). Now, however, parental immunity does not protect a parent against intentional acts. *Id.* at 930–31. Thus, parents have no immunity for assaults on their children.

In *Felderhoff,* the Supreme Court "set the boundaries for parent-child litigation." *Jilani v. Jilani,* 767 S.W.2d 671, 672 (Tex.1988) (quoting *Felderhoff*). The Court "retained the immunity rule with respect to 'alleged acts of ordinary negligence which involve a reasonable exercise of parental authority or the exercise of ordinary parental discretion with respect to provisions for the care and necessities of the child.'" *Id.* The rationale is that the right of the parent to use discretion in the discharge of these parental duties could be "seriously impaired" if the parents could be held liable for ordinary negligence that occurs while discharging those parental duties. *Id.*

■ The Supreme Court has recognized three exceptions to the doctrine of parental immunity: (1) intentional or malicious acts; (2) acts committed by parents in an employer-employee relationship with their child; and (3) the negligent operation of an automobile. *Hoffmeyer v. Hoffmeyer,* 869 S.W.2d

667, 668 (Tex.App.—Eastland 1994, writ denied).

■ The jury found that Michael assaulted John and awarded damages accordingly. We pointed out earlier that this finding covers many of the acts about which John complains. The remaining acts encompassed within the finding of negligence do not fall within any of the three exceptions that the Supreme Court has recognized. *Id.* Thus, a parent is immune from liability for this type of conduct.[8]

We now turn to the question of whether Michael, as a stepparent, may invoke the doctrine of parental immunity. In support of his position, Michael cites a single Texas case applying the doctrine to a stepparent, *i.e.,* *Hall v. Martin,* 851 S.W.2d 905, 910 (Tex. App.—Beaumont 1993, writ denied), *cert. denied,* 511 U.S. 1018, 114 S.Ct. 1399, 128 L.Ed.2d 72 (1994). John says that the doctrine should not be available to a stepparent, who has no legal duty to support a stepchild. He also says that the Beaumont Court simply assumed that the doctrine applied to the stepparent and, in any event, applying it was not necessary to the decision.

The record reveals that John never knew his biological father, who had died two months before his birth. Michael and Diane married when John was approximately eighteen months old. Michael and Diane divorced when John was seventeen. Thus, Michael was, according to Diane, "the only father figure that John had ever known." Diane testified that Michael asked about adopting John after they were married, but she "want[ed] him to keep his father's name." Consistent with the position of the Beaumont Court, we hold that the doctrine of parental immunity applies to a stepparent in Michael's position. *Id.*

In summary, the intentional acts are excepted from the doctrine of parental immunity. *Felderhoff,* 473 S.W.2d at 930–31. The remaining acts, which the jury found to be negligent, do not fall within a recognized exception to the doctrine of parental immuni-

barred by parental immunity. We do so because Michael is a stepparent. *See* footnote 5.

8. To the extent it applies, the doctrine protects negligent conduct, no matter how loathsome.

ty. Thus, John may not recover for them.[9] *Id.* We sustain point four.

Because Michael is protected by the doctrine of parental immunity from liability for the acts constituting negligence, we will reform the judgment to eliminate the actual damages that the jury awarded in connection with the negligence finding.

## MICHAEL'S COUNTERCLAIM

As we have noted, in an agreement that Diane signed individually, she agreed to (1) hold Michael harmless from liability on any judgment that she or John might recover that was not covered by insurance and (2) not to enforce any such judgment against Michael through legal processes. Michael filed a counterclaim against Diane and John for a declaratory judgment seeking "a construction of the Covenant Not to Enforce under the Uniform Declaratory Judgments Act that [Michael] has been released from liability to [Diane and John], that an accord and satisfaction has been reached in whole or in part, and that he has no personal liability to [Diane and John]." The court declined Michael's request to make findings about the agreement and incorporate them into the judgment. As far as we can determine, the court found only that John's claims were not barred by the agreement. In points five and six, Michael complains of the court's overruling his request and in "failing to find that Michael McGee is not personally liable on the judgment."

■■■ Because John was not a party to the divorce suit or the agreement, he is not bound by its terms. Thus, the court was correct in determining that the agreement did not bar his claims.

Michael asserts on appeal that the interpretation of the agreement is a question of law. Accepting that assertion, findings of fact would have been inappropriate. *See R & P Enter. v. LaGuarta, Gavrel & Kirk,*

*Inc.,* 596 S.W.2d 517, 518 (Tex.1980) (If a written instrument is so worded that it can be given a certain or definite legal meaning or interpretation, then it is not ambiguous and the court will construe the contract as a matter of law.). The agreement binds Diane to (1) hold Michael harmless from liability on any judgment that she or John might recover that was not covered by insurance and (2) not enforce any such judgment against Michael through process, turnover orders, garnishments, or other writ or process of every type or character and every type of court proceeding. The agreement does not provide that Michael "has been released from liability to [Diane and John], that an accord and satisfaction has been reached in whole or in part, and that he has no personal liability to [Diane and John]." Having no basis on which to grant the relief that Michael requested, the court did not err in failing to enter judgment that Michael is not personally liable. We overrule points five and six.

## CONCLUSION

We have found that parental immunity protects Michael from liability for negligence towards John, even though he is a stepparent. Thus, we must reform the judgment to eliminate the actual damages of $50,000 which the jury found to have resulted from the negligent acts.

The judgment is reformed to provide: (1) Plaintiff, John Deston Bardin, Jr., have and recover of and from Defendant, Michael Joseph McGee, the sum of $125,000; (2) he also recover prejudgment interest at the rate of ten percent per annum from August 6, 1993, until November 3, 1995, on the actual damages of $20,000; and (3) he recover postjudgment interest at the rate of ten percent per annum from November 3, 1995, until paid, on the sum of $125,000, for all of which let execution issue.

As reformed, the judgment is affirmed.

---

9. We do not reach the question of whether the doctrine protects a stepparent from gross negligence. The punitive damage question was conditionally submitted on an affirmative finding of assault *or* gross negligence. Because Michael does not attack the jury's finding of assault, the punitive damage award will stand. Thus, we need not consider whether parental immunity bars Michael's liability for gross negligence. *But see Hoffmeyer v. Hoffmeyer,* 869 S.W.2d 667, 668 (Tex.App.—Eastland 1994, no writ) (allegation of gross negligence does not preclude application of the doctrine of parental immunity).

## OPINION ON REHEARING

Each party filed a motion for rehearing. We will deny both motions, but will discuss some of our reasons.

John's motion for rehearing states, in pertinent part: "The Court of Appeals erred ... in sustaining Defendant's Point of Error No. 4 by reforming the trial court's judgment based upon the doctrine of parental immunity." He argues that parental immunity does not apply to gross negligence and, for the first time, that Michael, who is a stepparent, waived the doctrine by failing to obtain a jury finding that he was standing *in loco parentis* to John. Michael complains about our failure to address whether the evidence supports the finding of gross negligence.

### IN LOCO PARENTIS

Parental immunity is an affirmative defense that ordinarily must be pled to avoid waiver. *Shoemake v. Fogel, Ltd.*, 826 S.W.2d 933, 937 (Tex.1992). Michael pled parental immunity and objected to the negligence and gross negligence issues in the charge on the basis that the doctrine barred those claims as a matter of law.

In *Shoemake*, a biological mother recovered damages from the owners and manager of an apartment complex in a survivor's action. *Id.* at 935. Her child, who nearly drowned in the apartment swimming pool, later died. *Id.* The defendants sought contribution from the mother individually alleging negligent "management, supervision and control" of the child. *Id.* at 936. Based on jury findings, the trial court reduced her recovery. The Supreme Court found that parental immunity barred contribution even though the mother had not specifically pled the doctrine. *Id.* at 937. The defendants

alleged only ordinary negligence against the mother and asserted that the issues on appeal were "ones solely of law" as justification for not presenting a statement of facts. *Id.* at 936–37. The Court held: "Because the defense of parental immunity was apparent on the face of the pleadings, and its application was purely a matter of law, there was no need for a separate jury finding on immunity." *Id.* at 937–38.

Obviously, natural parents and adoptive parents enjoy immunity because of their legal relationship with their children. A stepparent, however, does not benefit from a legal relationship and may or may not act as a "parent" with respect to a given child.[1] One who through kindness or charity or other motive has received into his family and treats a child as a member thereof stands *in loco parentis*[2] (in the place of a parent) so long as the child remains in his family. *Trotter v. Pollan*, 311 S.W.2d 723, 729 (Tex.Civ. App.–Dallas), *writ ref'd n.r.e. per curiam*, 158 Tex. 494, 313 S.W.2d 603 (1958). The inquiry should be made about the stepparent's overall relationship to the child in question, rather than the specific conduct about which the child complains.

Michael is a stepparent, not John's biological or adoptive parent. John urges us to hold that Michael waived the parental-immunity defense by failing to obtain a jury finding that he was acting *in loco parentis*. This assertion was not before us on original submission. We struggled with the question of when a stepparent might be protected by parental immunity, because we understand that not every stepparent stands *in loco parentis* with every stepchild.

---

1. We recognize that the Family Code contains a definition of "parent." TEX. FAM. CODE ANN. § 101.024 (Vernon 1996). However, we do not believe that this definition controls the application of the doctrine of parental immunity. Sometimes the word "parent" in a statute includes one who merely occupies the position of a parent. *Hendricks v. Curry*, 401 S.W.2d 796, 801 (Tex.1966).

2. The generally-accepted common law meaning of *"in loco parentis"* refers to a person who has put himself in the situation of a lawful parent by

assuming the obligations incident to the parental relationship without going through the formalities necessary to legal adoption and embodies the two ideas of assuming the parental status and discharging the parental duties. *London Guarantee & Accident Co. v. Smith*, 64 N.W.2d 781, 784 (Minn. 1954) (parental immunity extends to stepparent standing *in loco parentis*); *Bricault v. Deveau*, 21 Conn.Supp. 486, 157 A.2d 604, 605 (1960); *see generally* W.W. Allen, Annotation, *Liability of Parent or Person in loco parentis for Personal Tort Against Minor Child*, 19 A.L.R.2d 423 (1951, Later Case Service 1996).

Although a jury finding about whether a stepparent stands *in loco parentis* may be required in some cases, none was required here. John's biological father died two months before his birth. His mother, Diane, married Michael when John was eighteen months old; they divorced when he was seventeen years old. Diane testified that Michael was the only father figure John had ever known.

We reaffirm our original holding that the doctrine of parental immunity protects "a stepparent *in Michael's position.*" *McGee v. McGee,* 936 S.W.2d 360, 367 (Tex.App.–Waco 1996) (emphasis added).

GROSS NEGLIGENCE

John argues that parental immunity covers only ordinary negligence and that the jury found Michael grossly negligent. Parental immunity does not protect a parent who commits wilful, malicious, or intentional wrongs against a child. *Felderhoff v. Felderhoff,* 473 S.W.2d 928, 930–31 (Tex.1971). The doctrine is restricted to "ordinary negligence and unintentional wrongs." *Id.* at 931.[3] The "real objective" of parental immunity is to "avoid undue judicial interference with parental discretion." *Shoemake,* 826 S.W.2d at 936.

The court charged the jury with the then-statutory definition of gross negligence:

"Gross negligence" means more than momentary thoughtlessness, inadvertence, or error of judgment. It means such an entire want of care as to establish that the act or omission in question was the result of actual conscious indifference to the

rights, welfare, or safety of the persons affected by it.

Act of June 16, 1987, 70th Leg., 1st C.S., ch. 2, § 2.12, 1987 Tex. Gen. Laws 44 (formerly TEX. CIV. PRAC. & REM. CODE ANN. § 41.001(5)).[4] Under the charge, the jury found gross negligence as an unintentional wrong.

Our Supreme Court has recognized only three exceptions to the doctrine of parental immunity: (1) intentional or malicious acts; (2) acts committed by parents in an employee-employer relationship with their child; and (3) the negligent operation of an automobile. *Hoffmeyer v. Hoffmeyer,* 869 S.W.2d 667, 668 (Tex.App.–Eastland 1994, writ denied). Although gross negligence could form the basis for another exception, we are not so inclined. Creating such an exception would not further the "real objective" of parental immunity, *i.e.,* avoiding undue judicial interference with parental discretion. *Shoemake,* 826 S.W.2d at 936. Thus, we hold that parental immunity bars recovery for gross negligence.[5]

Although not necessary to our disposition of the appeal, we would, were we called upon to address Michael's points, find that some probative evidence supports the finding of gross negligence. We believe that the evidence that Michael provided alcohol and objectionable materials to John raised an issue about whether Michael acted with such an entire want of care as to establish that the act or omission in question was the result of actual conscious indifference to John's rights, welfare, or safety.

**3.** Parental immunity remains a defense to "alleged acts of ordinary negligence which involve a reasonable exercise of ordinary parental authority or the exercise of ordinary parental discretion with respect to provisions for the care and necessities of the child." *Felderhoff v. Felderhoff,* 473 S.W.2d 928, 933 (Tex.1971); Parental choices are not reviewable "in the absence of culpability beyond ordinary negligence." *Shoemake v. Fogel, Ltd.,* 826 S.W.2d 933, 936 (Tex.1992).

**4.** Gross negligence was eliminated as a basis for exemplary damages effective September 1, 1995. TEX. CIV. PRAC. & REM. CODE ANN. §§ 41.001, 41.003 (Vernon Supp. 1997). Exemplary damages must now be based upon "clear and convincing evidence" of fraud, malice, or, in wrongful death cases, gross neglect. *Id.* § 41.003. However,

the current definition of "malice" closely resembles the objective and subjective prongs of gross negligence. *Id.* § 41.001(7); *Universal Serv. Co. Inc. v. Ung,* 904 S.W.2d 638, 641 & n.2 (Tex. 1995).

**5.** The doctrine of parental immunity has been the subject of several annotations. Romualdo P. Eclavea, Annotation, *Liability of Parent for Injury to Unemancipated Child Caused by Parent's Negligence—Modern Cases,* 6 A.L.R.4th 1066 (1981); Allan E. Korpela, *Liability of Parent for Injury to Unemancipated Child Caused by Parent's Negligence,* 41 A.L.R.3d 904 (1972); W.W. Allen, Annotation, *Liability of Parent or Person in loco parentis for Personal Tort Against Minor Child,* 19 A.L.R.2d 423 (1951).

The points asserting that the evidence does not support the award of actual damages were addressed in our original opinion.

The motions for rehearing are denied.