TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN








NO. 03-03-00234-CV






Timothy Kirk Colvin, Appellant


v.


Christine Renee Colvin, Appellee







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 126TH JUDICIAL DISTRICT

NO. FM1-05513, HONORABLE DARLENE BYRNE, JUDGE PRESIDING





 M E M O R A N D U M O P I N I O N




 The district court granted Christine Renee Colvin ("Vickrey") (1) a protective order
against Timothy Kirk Colvin after their divorce. Finding that Colvin had committed family violence
and that there was a potential for more violence, the district court restricted Colvin's contact and
communication with Vickrey and their child. Colvin contends that the district court erred by
granting the protective order because Vickrey's petition was deficient, res judicata should have
prevented the court from admitting evidence of pre-divorce events, and the evidence was insufficient
to support the court's finding of past and future family violence. We will affirm the judgment.


BACKGROUND


 In 1999, Vickrey and Colvin had a son ('the child"). Vickrey and Colvin were
divorced in March 2002. The court appointed them joint managing conservators, with Vickrey
having the right to designate the child's primary residence and Colvin having standard possession.

 In November 2002, Vickrey moved to modify the possession order and sought a
temporary restraining order and a protective order. The application for protective order did not have
a copy of the final divorce decree attached or a statement that the decree was unavailable but would
be filed before the hearing. An associate judge granted the application. Colvin appealed to the
district court, which held a de novo bench trial.

 Over Colvin's running res-judicata objection, discussed below, Vickrey introduced
evidence of threats and altercations occurring during their marriage. Vickrey's father, John
Zizelman, testified about seeing the aftermath of a dispute between Vickrey and Colvin at his lake
house in August 2001. Zizelman saw two legs broken off of an end table, two legs bent on a sofa,
wires hanging out of a wall where a portable phone base had been plugged in (he found the phone
base elsewhere), blood splattered over a bathroom door and bedroom door, and a bedroom door that
had been forced open. He testified that Colvin later called threatening to rip out the computers he
had installed at the family-owned school that the child attended; at the time, Colvin owned 49% of
the stock in the corporation running the school and was on the board of directors. Instead, Colvin
broke into the school office (the locks had been changed weeks before), removed some checks, and
cashed one; although he was named on the account, the accounts were for business purposes.

 Zizelman testified that, although 95% of his discussions with Colvin were calm and
rational, in the other 5% "things just go off the wall." In such a state, Colvin spoke with lots of
obscenities and would call repeatedly--usually at least six times and sometimes more than twenty. 
Zizelman estimated that he had approximately twenty such outbursts of conversations with Colvin
before the divorce and about eight to ten in the nine months after the divorce. Zizelman testified that
he felt he did not instigate Colvin's agitation, but usually tried to calm Colvin. Zizelman spoke
about a particular incident in the fall of 2001 after the couple separated, when Colvin was returning
from Little Rock with the child and became agitated at least in part because Zizelman and Vickrey
had not answered some questions Colvin had e-mailed them. Zizelman said that in repeated
telephone calls, Colvin's agitation escalated to threats that he would take the child away from Austin
and that Zizelman would never see the child again. Zizelman testified that he was so concerned by
the telephone calls that he drove to Austin from his office in Houston, arranged to pick up the child
in a grocery store parking lot, and had security standing by in case of violence. Zizelman testified,
however, that Colvin had calmed down and that the exchange occurred peacefully. 

 Zizelman also testified about more recent events that led to the request for the
protective order. On October 18, 2002, he received phone calls from both Vickrey and Colvin after
she had given Colvin possession of the child. Vickrey was upset because Colvin had the child in his
car and was calling her repeatedly while driving; Colvin called complaining that Vickrey would not
answer his calls and would not make time to discuss the issue of the child referring to Vickrey's new
husband as "Daddy." Colvin was quite agitated and using abusive language. Zizelman testified that
he was concerned, not by Colvin's language, but that his agitation would distract him from his
driving with the child in the car. Under cross-examination, Zizelman acknowledged that Colvin was
mostly upset that Vickrey would decide not to talk about an issue and hang up; Zizelman said that
Colvin told him he just wanted to set a time to talk about the issue of the child calling someone else
"Daddy," not that he necessarily had to talk about it at that time.

 On November 1, 2002, Zizelman was in Florida golfing and received a phone call
from Colvin who said this was Zizelman's "last chance" to provide information from the school that
the child attended and Zizelman owns. Colvin planned to go to the school to confront Vickrey,
despite a resolution by the board of directors of the school banning him from entering its premises
or contacting its employees. Zizelman testified that Colvin's phone calls and agitated behavior on
school premises had previously disrupted the business of the school, including other parents
dropping off or picking up their own children. Zizelman testified that Colvin called him five times
in two hours, explaining that he intended to go to the school to prove he was being denied access to
the child. Zizelman called his daughter and told her to get a Hays County deputy to the school. 
Meanwhile, Vickrey's husband had the child at a convenience store to make the exchange of custody
away from the school. Colvin went to the school, became agitated because he could not find the
child, then called Zizelman after confronting the deputy. (Vickrey's husband said he waited forty-five minutes, then went to do errands, one of which took him into a store where cell phone calls
could not reach him for about thirty minutes during part of this period.) After the possession
exchange was finally arranged, Colvin called Zizelman and said, "I'm going to get [the child] today
if I have to use force, and due to what you've done now, you are not ever going to see your F-ing
grandson again." Based on the level of Colvin's agitation, Zizelman called his new son-in-law and
advised him not to make the exchange because Colvin was too agitated to drive safely and care for
a young child. Vickrey's husband complied. Colvin then called Zizelman and threatened legal
action, but Zizelman hung up and finished his golf game. A few hours later, Zizelman received a
call from Colvin, who was slurring his words and wanting to talk to his son one last time; Colvin had
taken an overdose of medication and was in a hospital emergency room. Colvin recovered. 
Zizelman later testified that Colvin had, only days earlier, taken out a million-dollar life-insurance
policy on his own life to benefit the child.

 Zizelman testified that, within days, Colvin then threatened to bring actions against
him and/or Vickrey for interfering with child custody, for obtaining confidential medical information
without his consent, and for contempt. He said Colvin, an attorney, had threatened in about half of
their conversations to bring such actions to cost Zizelman large amounts of money because, as an
attorney, "he can do it for free."

 Under cross-examination, Zizelman conceded that a common theme in Colvin's
conversations was that he wanted more communication with Vickrey. Zizelman acknowledged that
he had been told that Vickrey's lawyers would not communicate with Colvin, who was proceeding
pro se at the trial level. Zizelman admitted that, under his direction, the school had not sent Colvin
educational records that were required to be provided under the decree; Zizelman said he had
believed that, when the child became a "drop-in" student rather than an enrolled one, the child no
longer came within the scope of regulations requiring the school to provide those records. Zizelman
said he nevertheless offered to send the records as a friend. Zizelman acknowledged that Colvin's
agitation generally concerned issues with Vickrey, and that Colvin had never threatened to hurt the
child.

 Vickrey testified that Colvin had been physically violent with her from the beginning
of the marriage. He punched her in her arm and stomach while they were driving in the Virgin
Islands. He once punched her in the back while she was holding the child. He also threw things
when angry. In August 2001, when he was angry and throwing things, Vickrey threatened to call the
police on the portable phone; Colvin responded by ripping the base of the phone out of the wall and
throwing the base at her. He cut his hand on the phone wires. She did not leave the house because
their son was sleeping there, but retreated to a guest bedroom; Colvin broke down the door. He then
went to the school and broke in. She testified that the occasions on which Colvin got out of control
verbally were too numerous to count. She testified that she did not request a protective order earlier
because things seemed to be calming down after the divorce when Colvin was out of state for several
months. She said that their interactions were smooth for a while after he returned.

 Vickrey testified that she tried to avoid discussing the child's calling her new husband
"Daddy" and calling Colvin "Tim" because the child was present. She said she hung up on Colvin
repeatedly hoping that he would stop calling, because during the calls he was abusive and agitated;
she said she was concerned because their three-and-a-half-year-old boy was in Colvin's back seat. 
She testified that she feared for what the child would understand and feared that Colvin would not
be able to drive safely. She said that she believes Colvin has medication to control his anger but
often will not take it before driving to exchange possession of the child because the drug makes him
drowsy. (Colvin clarified that he had medication for depression, not for anger control.) She testified
that she has no doubt that Colvin could be physically violent toward her in the future. She expressed
concern about his possession of a gun, though Colvin interrupted and offered to turn in his license
to carry a concealed weapon and stipulate that he would not carry it any more.

 Vickrey testified that Colvin calls her at work repeatedly using abusive language. She
estimated that she has had to leave work 10 to 15 times in order to get him to stop calling there. She
said that the school has left the phone off the hook to stop Colvin's calls. She said that the temporary
protective order had stopped the calls "somewhat." She conceded on direct examination that he had
not physically assaulted her since August 2001; she also testified that she had not been around him
much since that day. His history of physical violence, however, makes her fearful when he becomes
verbally abusive and agitated.

 On cross-examination, Vickrey testified that she resisted supplying business records
to Colvin and that, if the court ordered her to produce some of those records because the child was
a student at the school, she would withdraw him from the school.

 Vickrey testified that, after the hearing on the protective order before the associate
judge, Colvin violated the order by phoning her. She testified that Colvin was controlling and
became agitated if things were not done his way. She testified that, although she had given into him
before, she had stopped. She testified that she was asking for the Court's help in setting reasonable
boundaries.

 Colvin admitted having anger management problems when dealing with Vickrey. He
admitted that his repeated phone calls using abusive language were inappropriate, especially when
his son was in the backseat of the car. He said that he took an overdose of sleeping pills because he
had been very upset about not getting possession of the child on the weekend of a planned camping
trip and had trouble falling asleep; he said that the overdose was an accident, not an attempted
suicide. He acknowledged that supervised visitation was advisable, but requested using a friend
rather than paying an agency to supervise.

 Dr. Carol Butler, the psychologist who was treating Colvin, testified that she did not
think he posed a danger to the child. She said that Colvin's impulsive behavior and thoughts did not
indicate violent tendencies toward the child. She said that Colvin told her he thinks Vickrey is a
good mother, and so would not be tempted to take the child away from her on that basis. Butler 
testified that past behavior is the best predictor of future behavior. She also testified that Colvin told
her he talked about nonviolence with the child, and that the child seemed happy and showed little
violence during play for a child his age. She did not think that Colvin needed supervised visits.

 At the close of the hearing, the district court granted the protective order. The court
found that family violence had occurred and was likely to recur. The court found that the protective
orders were in the best interest of Vickrey and the child. The court restricted Colvin from being
within 100 yards of Vickrey or communicating directly with her. The court put the same restrictions
on Colvin's contact with the child, except during his supervised visits with the child at Kids
Exchange. The court also prohibited Colvin from behaving toward Vickrey and the child in ways
that were violent, harassing, annoying, alarming, abusive, tormenting, or embarrassing. The court
specified the times that Colvin and Vickrey must arrive and depart from Kids Exchange for Colvin's
supervised visits so that they were not on site at the same time. The court ordered a psychiatric
evaluation of Colvin, and counseling for both Colvin and Vickrey. The court ordered Colvin to
relinquish both his handgun license and any handguns to the Hays County Sheriff's Department.

DISCUSSION


 Colvin raises three issues on appeal. He contends that the court should not have
considered Vickrey's application because it was defective, that the court should not have heard
evidence about pre-divorce acts of violence because they should have been raised previously, and
that insufficient evidence supports the finding of past and future family violence.

 Colvin contends that Vickrey's application failed to comply with two requirements. 
She did not attach either a copy of the divorce decree or a statement that the decree was unavailable
and that a copy of the decree would be filed with the court before the hearing on the application. See
Tex. Fam. Code Ann. § 82.006 (West 2002). Vickrey admitted that she did not attach either
document to her application. Colvin complains that she also listed her county of residence as Travis
County despite having moved to Hays County. See id. § 82.004. Vickrey admitted that the
statement of her residence was a mistake because she moved to Hays County sometime around May
2002. To be entitled to reversal, however, an appellant must show that any error probably caused
the rendition of an improper judgment or probably prevented Colvin from presenting his complaint
to this Court. See Tex. R. App. P. 44.1(a). Colvin has not alleged any harm. The agreed divorce
decree was rendered less than a year before the application was filed, so there is no indication that
Colvin was unaware of or had no access to the decree; a copy is in the appellate record before this
Court. Nor do we find any harm from the failure to allege the proper county of residence. Vickrey's
application for protective order lists her residence as being in Dripping Springs, Texas, which is in
Hays County. The ex parte temporary protective order issued before the hearing on the protective
order restrains Colvin from going to or near her residence in Dripping Springs. Further, Colvin
indicated at the hearing that he knew Vickrey had moved in the summer of 2002. We find no harm
from the court hearing the application despite these procedural deficiencies.

 Colvin contends that the court erred by hearing evidence of pre-divorce incidents that
should have been raised during the divorce proceeding. A claim of res judicata requires proof that
the same parties (or their privies) were involved in a previous action in which a final judgment on
the merits was rendered, and that a second action is based on the same claims as were raised or could
have been raised in the previous action. Amstadt v. United States Brass Corp., 919 S.W.2d 644, 652
(Tex. 1996). A final judgment in a custody suit is res judicata regarding the child's best interest
under the conditions then existing. (2) Knowles v. Grimes, 437 S.W.2d 816, 817 (Tex. 1969). 

 We examine the district court's decision to admit evidence for an abuse of discretion. 
City of Brownsville v. Alvarado, 897 S.W.2d 750, 753 (Tex. 1995); In re Commitment of Browning,
113 S.W.3d 851, 865 (Tex. App.--Austin 2003, pet. denied). A trial court abuses its discretion
when it acts without regard for any guiding rules or principles. Downer v. Aquamarine Operators,
Inc., 701 S.W.2d 238, 241-42 (Tex. 1985). In cases specifically addressing the admissibility of
evidence of pre-divorce conduct in motions to modify divorce decrees, courts have held that
evidence of prior conduct of one of the parties can be introduced to corroborate evidence of similar
conduct since the decree. In re C. E. B., 604 S.W.2d 436, 443 (Tex. Civ. App.--Amarillo 1980, no
writ); see also Wilson v. Elliott, 73 S.W. 946, 947 (Tex. 1903).

 At issue here is whether Colvin's behavior posed a danger to Vickrey and the child. 
Colvin's res judicata claim falters because Vickrey's complaint is not limited to pre-divorce
instances, but was prompted at least in part by his actions after the divorce on October 18 and
November 1, 2002, which included the recurrence of the spiraling anger and the new action of the
drug overdose. Further, Butler, Colvin's treating psychologist, opined that the best predictor of
future behavior was past behavior. Thus, according to his own witness, Colvin's occasionally
violent and often verbally abusive pre-divorce behavior could shed light on his potential behavior. 
Despite the lull in such activities during much of 2002, the recurrence of Colvin's spiraling anger
allowed for an exploration of previous behavior to provide context and guidance for the assessment
of future behavior. We cannot say that the court abused its discretion by permitting evidence of
Colvin's pre-divorce behavior.

 Colvin also challenges the sufficiency of the evidence to support the findings that
family violence had occurred and is likely to occur in the future. Both findings are required before
a court may issue a protective order under the family code. Tex. Fam. Code Ann. § 85.001(a) (West
2002). The legislature has defined family violence in relevant part as 


an act by a member of a family or household against another member of the family
or household that is intended to result in physical harm, bodily injury, assault, or
sexual assault or that is a threat that reasonably places the member in fear of
imminent physical harm, bodily injury, assault, or sexual assault, but does not include
defensive measures to protect oneself . . . .

Id. § 71.004(1). Colvin contends that, even if we consider the pre-divorce incidents, there is no
evidence of the intent requisite to show family violence. He contends that this absence of intent
prevents a showing of the likelihood of future violence, as does the absence of a pattern of violence.

 Colvin challenges both the legal and factual sufficiency of the evidence. We review
the sufficiency of the evidence to support a trial court's findings of fact by the same standards we
use in reviewing the sufficiency of the evidence supporting a jury's findings. See Catalina v.
Blasdel, 881 S.W.2d 295, 297 (Tex. 1994); Starcrest Trust v. Berry, 926 S.W.2d 343, 352 (Tex.
App.--Austin 1996, no writ). In reviewing a legal-sufficiency challenge, we consider the evidence
in the light most favorable to the prevailing party, indulging every reasonable inference in that
party's favor. Merrell Dow Pharms., Inc. v. Havner, 953 S.W.2d 706, 711 (Tex. 1997); Associated
Indem. Corp. v. CAT Contracting, 964 S.W.2d 276, 285-86 (Tex. 1998). We will uphold the finding
if more than a scintilla of evidence supports it. Burroughs Wellcome Co. v. Crye, 907 S.W.2d 497,
499 (Tex. 1995); Catalina, 881 S.W.2d at 297. The evidence supporting a finding amounts to more
than a scintilla if reasonable minds could arrive at the finding given the facts proved in the particular
case. Burroughs Wellcome Co., 907 S.W.2d at 499. In conducting a factual-sufficiency review, we
consider and weigh all of the evidence and set aside the judgment only if it is factually so weak or
so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. See Cain
v. Bain, 709 S.W.2d 175, 176 (Tex. 1986); In re King's Estate, 244 S.W.2d 660, 661 (Tex. 1951).

 Colvin's argument that there is no evidence that he intended to hurt anyone ignores
the evidence, the reasonable inferences, and the alternative legal standard for family violence. 
Colvin points to the lack of testimony that he intended to harm anyone and to Vickrey's statement
that she was not sure whether Colvin's aim was to hurt her. Yet there was uncontroverted testimony
that he punched Vickrey while driving at the beginning of their marriage, and later punched her in
the back while she was holding the child. There is no evidence to counter the clear, reasonable
inference that Colvin intended to hurt Vickrey when he punched her--particularly when her back
was turned and she was holding their child. Further, Colvin ignores the alternative legal standard
for family violence that involves, not an intentional assault, but "an act by a member of a family or
household against another member of the family or household . . . that is a threat that reasonably
places the member in fear of imminent physical harm, bodily injury, assault, or sexual assault." Tex.
Fam. Code Ann. § 71.004(1). Whether Colvin intended to injure Vickrey when tossing furniture and
appliances and breaking down a door, Vickrey testified that Colvin frightened and intimidated her
when he started throwing things like a chair and the base of a phone she intended to use to call
police. There was testimony that, more than once--including on November 1, 2002--Colvin
threatened to use force to effect a change in possession of the child. The evidence is legally and
factually sufficient to support the finding of past family violence.

 This history, coupled with the late 2002, post-divorce recurrence of the spiraling
anger and the new element of the drug overdose, provides sufficient evidence to support the court's
conclusion that family violence was likely to occur in the future. Although Colvin had not used
physical force against or around family members since August 2001, he threatened to use force to
get possession of the child in late 2002. His behavior was consistent with previous instances in
which he had engaged in actions that either hurt Vickrey or placed her in fear of imminent injury. 
Although the two no longer lived together, Colvin's anger, threats of force, and occasion to interact
with family members in order at least to change possession of the child support the court's
conclusion that family violence was likely.

 We note that the court appears to have tailored the protective order to the particular
threats posed. The court attempted to remove triggers for Colvin's anger by formalizing the
possession exchange and forbidding direct contact between Vickrey and Colvin. The court sought
to address factors predisposing them to conflict by ordering psychological counseling for both
parents. The court sought to eliminate a tool for expressing anger, and a source of Vickrey's fear, 
by having Colvin surrender his gun license and gun. In all these things, the court's order is
proportionate to the nature and causes of past family violence and the likelihood of future family
violence.

CONCLUSION


 We conclude that the district court did not err by considering and granting the
application for protective order because the deficiencies alleged in the application were not shown
to have harmed Colvin in the trial court or in this Court. Likewise, the court did not err by admitting
evidence of pre-divorce incidents, or by finding the evidence sufficient to support a protective order. 
We affirm the order.


 __________________________________________

 W. Kenneth Law, Chief Justice

Before Chief Justice Law, Justices B. A. Smith and Patterson

Affirmed

Filed: April 22, 2004
1. In district court documents, including the protective order, appellee's last name is "Colvin." 
In her appellate brief, however, she uses the last name "Vickrey"--her new married name. Because
no one has requested that we change the style of the case, we will refer to appellee as "Colvin" in
the style of the case and in the judgment. For ease in distinguishing the parties in the body of the
opinion, however, we will refer to appellee as "Vickrey" and reserve "Colvin" for appellant.
2. This principle of res judicata is woven into the family code's requirement that a person
challenging a custody decree must show that circumstances have changed materially and
substantially since the time of the order. See Tex. Fam. Code Ann. § 156.101 (West 2004).